**Michelle OLIVER et al.,
Plaintiffs-Appellees,**

v.

**KALAMAZOO BOARD OF EDUCATION
et al., Defendants-Appellees,**

**State Board of Education et al.,
Defendants-Appellants.**

**Nos. 79–1042, 79–1101 and 79–1723.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 14, 1980.

Decided Dec. 15, 1980.

---

Frank J. Kelley, Atty. Gen. of Mich., Thomas L. Casey, Gerald F. Young, Richard P. Gartner, Asst. Attys. Gen., Robert A. Derengoski, Sol. Gen., Lansing, Mich., Michael H. Jackson, Denver, Colo., Louis R. Lucas, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., for defendants-appellants State Bd. of Ed. et al.

Arthur Staton, Jr., Ford, Krickard, Staton, Allen & Decker, Kalamazoo, Mich., for defendants-appellees Kalamazoo Bd. of Ed. et al.

Philip L. Hummer, Kalamazoo, Mich., Nathaniel R. Jones, Gen. Counsel, NAACP, New York City, Stuart J. Dunnings, Jr., Dunnings & Canady, Lansing, Mich., John A. Dziamba, Williamatic, Conn., Thomas I. Atkins, Boston, Mass., for plaintiffs-appellees.

James A. White and Thomas A. Baird, Foster, Swift, Collins & Coey, Lansing, Mich., for intervenors.

James S. Brady, U. S. Atty., Grand Rapids, Mich., Samuel J. Flanagan, Jr., Brian K. Landsberg, Dept. of Justice, for U. S. intervenors.

Before WEICK and BROWN, Circuit Judges, and PECK, Senior Circuit Judge.

BAILEY BROWN, Circuit Judge.

This school desegregation case involving the city schools of Kalamazoo, Michigan began in August, 1971, when this action was brought by the National Association for the Advancement of Colored People and certain students in the system. The Kalamazoo Board of Education and its individual members (referred to in the record and herein collectively as KBE) were named as defendants. Early in the litigation, the Kalamazoo Education Association and the Michigan Education Association, teacher organizations, intervened first as amici and then as parties plaintiff, and the Michigan State Board of Education and its Superintendent of Public Instruction (referred to in the record and herein collectively as SBE) were joined as defendants.

The district judge, Honorable Noel P. Fox, promptly entered a temporary injunc-

tion placing a desegregation plan in effect immediately. This injunction was made final two years later in 1973, KBE and SBE being held jointly liable with respect to the unconstitutional racial segregation found to have existed in the school system, and both decrees have been affirmed on appeal.

The present round of litigation began in 1977 when plaintiffs sought additional and ancillary relief. The district court ordered KBE to file a progress report, which was done, and then the district court appointed experts to study the report and the school system and to make recommendations to it. In November, 1978 and in January, 1979, the district court entered three orders requiring SBE to pay the accrued salaries of the staff of the experts, and these orders are the subject of two of the instant appeals. (Nos. 79–1042 and 79–1101).

In the fall of 1979, the report and recommendations of the experts having been filed, plaintiffs moved the district court in behalf of minority students to order implementation of the recommendations, which the court did after a hearing in November. The district court granted no relief with respect to some racial imbalance found by the report to exist in some schools and took no action with respect to the racial composition of the teachers, administrators, and supporting staff, but ordered to be implemented all of the recommendations as to ancillary programs, both cognitive and behavioral. This order is the subject of another appeal by SBE that is before this panel (No. 79–1723) and is the subject of an appeal by KBE (No. 80–1006) heard by another panel (Engel, Brown and Peck, JJ.) [1] Also, in the fall of 1979, when it appeared that KBE would not be able to obtain continued financing for 1979–1980 from the federal government for certain of its ongoing ancillary cognitive and behavioral programs for minority students under the Emergency School Aid Act, 20 U.S.C. §§ 1601 et seq., (referred to in the record and herein as ESAA), it moved the district

court to require SBE to make up this deficit or to reimburse it. The district court, at the conclusion of the aforementioned November, 1979, hearing, likewise ordered SBE to pay such amount to KBE, and this order is also a subject of SBE's appeal in No. 79–1723 before this panel.

Although we have just set out a brief overview of this litigation in order to indicate in a general way the issues on the appeals before us, it is necessary, in dealing with the issues presented, to develop the history of this litigation in considerable detail.

I

Prior to 1971, there had been considerable activity by citizens of Kalamazoo, particularly the Citizens Racial Balance Committee, to desegregate the Kalamazoo public schools. In the spring of that year, using information as to pupil identity, race, location, and grade supplied to it by KBE, the Illinois Institute of Technology, by employing computers, devised a desegregation plan. This plan was adopted by KBE on May 7, 1971. However, shortly thereafter, two of the members of KBE, as a result of an intervening election, were replaced, and in July, 1971, the action of KBE approving the plan was rescinded by a divided vote, and the former school attendance boundaries were reestablished but with voluntary open enrollment. This action was then filed on August 12, 1971.

On August 12, 1971, the district court entered a temporary restraining order, restraining KBE from implementing the voluntary open enrollment plan. Then, on August 20, 1971, the district court, after a hearing, issued a temporary injunction, placing the plan that had been adopted by KBE on May 7, 1971 immediately in effect, and the plan was thereby made applicable to the 1971–72 school year. 346 F.Supp. 766 (W.D.Mich.1971). In so doing the district court found that, according to the 1970 school census, the school system was 17.6%

1. This occurred because SBE's instant appeals in Nos. 79–1042, 79–1101 and 79–1723 were heard in February, 1980, and KBE's appeal was heard in June, 1980. In June, Judge Weick being ill, Judge Engel was substituted for him on the panel.

black, that five of the elementary schools were majority black, that the other schools in the system, twenty-four, were majority white, and that the system was unconstitutionally segregated. Under this plan, some of the elementary schools (grades K–6) became schools with grades K–3 and others became schools with grades K, 4–6. The plan called for considerable busing.

This court affirmed the granting of the temporary injunction on August 30, 1971, 448 F.2d 635 (6th Cir. 1971), holding that the district court's issuance of the temporary injunction was not contrary to a rule of equity or an improvident exercise of judicial discretion, but it expressly refrained from approving all of the language and holdings of the district judge.

In 1973, the district court held a plenary hearing, and determined again that the Kalamazoo schools had been racially segregated in 1971, that the segregation was *de jure* since it resulted from policies and practices carried out by KBE to accomplish segregation or with knowledge that such would bring about segregation, and therefore, on October 4, 1973, it reaffirmed the liability of KBE for the segregation. 368 F.Supp. 143 (W.D.Mich.1973). The district court also held that SBE was liable for such segregation on two grounds: (1) that segregated schools had resulted from segregated neighborhoods which were in part a result of the enforcement of racial covenants by Michigan courts and (2) that under the Michigan constitution and statutes, SBE had the authority and the duty to supervise and regulate local school boards and activities, including the duty to prevent unconstitutional segregation, and SBE had failed to exercise this authority and carry out this duty.

In its order of October 4, 1973, the district court made permanent the existing temporary injunction by which the plan that had been adopted by KBE on May 7, 1971 had been placed in effect on August 20, 1971. The court retained jurisdiction to supervise implementation of the plan, and the order provided that any party moving for alteration or amendment of the plan would have the burden of justifying the changes. SBE was required to render assistance to KBE in the execution of the court's order. KBE was ordered to apply to the federal government for such financial assistance as might be available to aid KBE in executing the order. SBE was ordered to apply to the Michigan legislature for financial assistance for KBE and to aid KBE in making its federal applications and to join with KBE in its applications to the Michigan legislature for aid.

During the course of the proceedings leading up to the plenary hearing, counsel for KBE, on August 2, 1972, moved the district judge to recuse himself. The affidavit in support of the motion charged bias on the part of the judge in favor of plaintiffs, its counsel, and their position and against KBE, its counsel and its position. More particularly, the affidavit charged, *inter alia*, that the judge had prejudged the issues and had exhibited a difference in his treatment of counsel and witnesses on plaintiffs' side and on KBE's side. This motion was denied, and the denial was a subject of the appeal of the court's entry of the permanent injunction.

On the appeal by KBE and SBE of the granting of the permanent injunction, this court, by a divided panel, affirmed. 508 F.2d 178 (6th Cir. 1974), *cert. denied* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). The majority held that the court had applied a correct legal standard for determining liability, that is, that liability for segregation in schools is established if it is shown that there was action or inaction by the public officials, that there was a segregative purpose, and that such results in increased or continued segregation in the public schools. The majority also found that the factual findings of the district judge were adequately supported by the record. The court held that SBE was properly found to be liable because it had the authority and duty to act to prevent unconstitutional segregation and had not done so. The majority likewise held that the affidavit as to bias, even if taken as true, was insufficient under 28 U.S.C. § 144 since the

bias necessary for recusal must be personal bias. The dissenting judge was of the view that the district judge had acted too hastily in initially implementing the desegregation plan, had made errors of law with respect to liability, and that the affidavit sufficiently alleged the kind of bias that requires recusal.

The next activity of consequence to the present round of litigation took place in 1977.[2] On motion of plaintiffs, on August 15, 1977, the district court ordered KBE to file a full report within twenty-one days on the implementation of its desegregation order and to give details on the progress in "eliminating the effects of prior segregation" and on the efforts that KBE deemed necessary to "cure the condition found to offend the Constitution." KBE was also ordered to consider the "educational components examined and upheld by the United States Supreme Court in *Milliken v. Bradley*, [97 S.Ct. 2749, 53 L.Ed.2d 745] 45 U.S. L.W. 4873)."

·KBE filed the report as directed and within the short time allowed. On motion of plaintiffs, on December 7, 1977, the district court appointed Dr. Wilbur J. Cohen, Dean of the School of Education at the University of Michigan and Dr. Robert L. Green, Dean of the College of Urban Development, Michigan State University, as the court's experts to evaluate the report and make recommendations, and the order authorized them to employ staff, and it provided that fees and expenses incurred in preparation of such report would be assessed as costs to be paid by SBE.[3] The district court then entered orders on No-

vember 27, 1978, January 10, 1979 and January 23, 1979 directing SBE to pay specific amounts to cover salaries of the staff aiding Green and Cohen, and the appeals by SBE from these orders are now before this court (Nos. 79–1042 and 79–1101) for decision.[4]

## II

■ Plaintiffs-appellees contended in a motion to dismiss these appeals that these orders requiring SBE to pay the accrued salaries of the Green-Cohen staff are interlocutory and not appealable. We are, however, of the opinion that these orders are in the nature of an injunction and are appealable under 28 U.S.C. § 1292(a)(1). *Reed v. Cleveland Board of Education*, 581 F.2d 570 (6th Cir. 1978).

■ SBE contends that the district court had no authority to issue the orders requiring it to pay the salaries of the Green-Cohen staff because the staff's mission was not in any wise to determine whether KBE had complied with the desegregation orders that had been entered but rather was to determine whether additional and ancillary cognitive and behavioral programs were required. The short answer to this argument is that, as will be seen upon consideration of the district court's order requiring KBE to file the above outlined report, one of the purposes of requiring the report was to determine whether KBE had complied with the desegregation orders.

SBE also argues that, in any event, the main purpose of requiring KBE to file the report and in appointing experts to study the report and to make recommendations

---

**2.** This case got to this court on KBE's and SBE's motion to tax some of the costs on the prior appeal against plaintiffs on the ground that they had needlessly designated much of the record for the appendix and that the printer's per page rate was too high, creating a total bill of $110,434.41. This court agreed and taxed part of the costs against plaintiffs-appellees. 519 F.2d 619 (6th Cir. 1975).

This case also was before this court on appeal of the district court's award of attorneys' fees against SBE and KBE of $507,067. This amount was arrived at by determining a reasonable hourly rate for the attorneys and then doubling the amount for four lead attorneys on

the ground that they had vindicated important rights. On appeal, this court determined that such doubling of the rate was an abuse of discretion and reduced the fees to $283,925. 576 F.2d 714 (6th Cir. 1978).

**3.** SBE appealed the appointment of the experts and the assessment of such future and undetermined costs against it, but this appeal was dismissed by order as being premature on March 7, 1978.

**4.** These orders were stayed by this court on February 7, 1979.

was to determine whether ancillary cognitive and behavioral programs should be ordered by the court. SBE further argues that once the desegregation ordered by the court had been accomplished, the district court was without power to order implementation of such ancillary programs, relying on *Pasadena City Board of Education et al. v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). It is true that the Court there held that if, under a court-ordered desegregation plan, a school system reaches a state of constitutional grace with respect to desegregation, it is not required to make changes in student assignments where there has been a subsequent change in the racial mix in the schools caused by factors for which the school board could not be considered responsible. 427 U.S. at 434, 96 S.Ct. at 2703. *Pasadena* did not, however, hold that a district court did not have the authority and duty to order such ancillary programs if such were found to be necessary to cure the effects on the black children of the prior unconstitutional school segregation. Moreover, while we will deal with this question hereafter in more detail in considering other issues, *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*Milliken II*), clearly held that a district court has the authority to order the implementation of such ancillary programs if it is shown that such are necessary to cure the effects of prior unconstitutional school segregation.

Accordingly, we conclude that the district cout acted within its authority and did not abuse its discretion in ordering SBE to pay the salaries of the Green-Cohen staff and that these orders of the district court must therefore be affirmed.

### III

On August 15, 1979 the Green-Cohen report was filed. The report, including appendix, consists of 453 pages. There are twenty-eight pages of conclusions, summary and recommendations.

On September 18, 1979, KBE filed a motion to join the state Treasurer as a party defendant (this was done) and to require state funding of the ESAA programs for minority students for 1979–80 since such funding was no longer available from the federal government and KBE had been unsuccessful in persuading the Michigan legislature to appropriate the funds. On September 20, plaintiffs filed a motion to require the implementation of the recommendations of the Green-Cohen report "in toto."

The district court held concurrent hearings in late October and early November. It then ordered on November 30, 1979 that KBE continue the ESAA programs and that the State of Michigan pay $651,289.54 to KBE to replace or reimburse funding for ESAA programs for 1979–80 that was no longer available from the federal government. It also ordered that all recommendations of the Green-Cohen report must be implemented by September 1, 1980, except those having to do with some racial imbalance in the schools and those having to do with the racial composition of the teachers, administrators and supporting staff. It further ordered KBE to devise specific programs to implement these ancillary recommendations, both cognitive and behavioral, of the Green-Cohen report by February 15, 1980. It still further ordered KBE: "In drafting these programs, District officials are to consult with Dr. Robert Green and his staff and are to abide by any of their suggestions." Lastly, the order provided: "After drafting these programs, the District is to submit them to the court. A hearing will be held at a later date, at which the remedies and their expected costs will be examined; at that time I will determine who should bear the costs of these programs."

As has been stated, SBE has appealed the order requiring the State of Michigan to pay to KBE $651,289.54 to replace ESAA funds and has appealed the order requiring the implementation of the Green-Cohen recommendations (No. 79–1723). As has also been stated, KBE has appealed the order requiring the implementation of the Green-Cohen recommendations (No. 80–1006), which appeal was heard by another panel. Before discussing the instant appeal by

SBE in No. 79–1723, we will describe briefly later developments in the district court.

As it was directed to do by the district court, KBE filed with the court on February 15, 1980 a specific program-plan to carry out the Green-Cohen recommendations. This document consists of eighty-eight pages, and the program has a projected three-year cost of eight and one-half million dollars.

On February 28, 1980, the district court scheduled a hearing to begin on March 19 to consider the KBE plan to carry out the Green-Cohen recommendations. SBE sought a continuance of such hearing on the ground that the district court had no jurisdiction since SBE had appealed the court's November 30, 1979 order requiring the implementation of the Green-Cohen recommendations, that the appeal had been argued in February, 1980, and that the appeal had been taken under advisement by this court. The district court denied the continuance, stating that it would hear and determine the jurisdictional question at the inception of the hearing on the propriety of the plan submitted by KBE. This meant, of course, that SBE would have to continue to prepare for the hearing. On application of SBE, this court, on March 17, 1980, ordered that the proceedings contemplated by the district court be held in abeyance since, in view of SBE's pending appeal, the district court had no jurisdiction. *Hogg v. United States*, 411 F.2d 578 (6th Cir. 1969). In the same order, this court stayed the order of the district court of November 30, 1979 requiring payment by the state of funds to replace ESAA funds and requiring implementation of the Green-Cohen recommendations.

On March 10, 1980, apparently acting *sua sponte* and *after* KBE had filed its plan of programs to implement the Green-Cohen recommendations as was required by the district court, the district court in an order determined that its order of November 30, 1979 was erroneous in one respect. It determined that it had improperly delegated its judicial authority in ordering KBE: "In drafting these programs, the District is to consult with Dr. Green and his staff and is to abide by any of their suggestions." The order of November 30, 1979 was in effect amended to provide that KBE should "consult with Dr. Green and his staff on how to implement the recommendations of the Green-Cohen report." The plan had, of course, already been prepared weeks before and filed by KBE with the court.

## IV

■ SBE contends that the district court had no jurisdiction to hold the hearings in late October and early November, 1979 and to issue its order on November 30, 1979 with respect to continuance of and payment for the ESAA programs and with respect to implementation of the Green-Cohen recommendations because SBE had appealed the prior orders of the district court requiring it to pay the accrued salaries of the Green-Cohen staff.

We conclude that, on the contrary, such appeal of the orders requiring SBE to pay the accrued salaries of the experts' staff did not remove jurisdiction from the district court to make the determinations with respect to the ESAA programs and the Green-Cohen recommendations because such payment orders did not finally determine the entire action and the issues presented at the November 30, 1979 hearing on ESAA and Green-Cohen were not involved in the prior appeals. 9 Moore's Federal Practice § 203.11. With respect to the payment orders, the only issue on appeal was whether the district court abused its discretion in requiring SBE to pay the accrued salaries of the Green-Cohen staff who were investigating and reporting to the court as to whether KBE had complied with the desegregation orders and as to the progress of minority students. This was not the issue considered by the district court at its hearing on the constitutional necessity of continuing the ESAA programs and implementing the Green-Cohen recommendations. We therefore conclude that the district court retained jurisdiction to hold such hearings and to issue the order requiring continuance of the ESAA pro-

gram to be funded by the state and requiring implementation of the Green-Cohen recommendations.

## V

The propriety of the district court's requiring the continuance of the ESAA programs and requiring the State of Michigan to pay $651,289.54 to KBE to reimburse it for the costs of continuing such programs that had been funded under ESAA and the propriety of its requiring the implementation of the ancillary cognitive and behavioral recommendations of the Green-Cohen report present one underlying and overriding common issue. This issue is: does the record support the conclusion that black pupils in the Kalamazoo school system would be denied equal protection unless such ESAA programs were continued and such Green-Cohen recommendations were implemented? It is true, as will be seen, that the programs that had been supported by ESAA funds and the programs indicated by the Green-Cohen recommendations are somewhat different in their approach and thrust in seeking to enhance black achievement in the school system, but the district court, as also will be seen, had no authority to order the continuance of the ESAA program or the implementation of the Green-Cohen recommendations unless such was constitutionally required.

There are, of course, other issues. One such issue is whether, assuming the district court was correct in determining that the continuation of the ESAA program was constitutionally necessary, it was proper for the district court to place the entire burden of such program on all of the taxpayers of the State of Michigan rather than to place the entire or at least part of the burden directly on the taxpayers of Kalamazoo. Another issue is whether, assuming the record supports the constitutional necessity for some ancillary cognitive and behavioral programs to aid minority students, it has been shown that either of these programs is reasonably calculated to be effective.

## VI

As before indicated, SBE contends that the district court had no authority to order the continuance of the ESAA programs and the implementation of the Green-Cohen recommendations. In so contending, SBE seems to argue that, under the *Pasadena* decision, *supra*, once the Kalamazoo system was constitutionally desegregated, no further remedy could constitutionally be required. However, *Pasadena*, as we have before stated, does not so hold. Moreover, as we also before stated, in *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*Milliken II*), the Court squarely held that, in addition to ordering desegregation of a school system, the district court may properly order ancillary programs to enhance the achievement of black children if such is necessary to cure the effect on the black children of unconstitutional school segregation. It is true that, in *Milliken*, the ancillary programs approved by the Court had been proposed by the Detroit School Board itself.[5] It is also true that, in *Milliken*, the programs were found to be necessary and were implemented at the inception of the desegregation of the Detroit system. However, there is no indication in the *Milliken* opinion that the fact that the ancillary program had been proposed by the local school board was necessary to the decision. Further, there is no indication in the opinion that such ancillary programs may only be required at the time the system is desegregated.

In *Milliken II*, the Court stated (433 U.S. at 281–282, 97 S.Ct. at 2757):

The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the constitutional violation itself. Because of this inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a viola-

---

**5.** The state defendant had appealed the granting of this ancillary relief.

tion, see *Pasadena Bd. of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976) or if they are imposed upon governmental units that were neither involved in nor affected by the constitutional violation, as in *Milliken I*, supra. *Hills v. Gautreaux*, 425 U.S. 284, 292–296, 96 S.Ct. 1538, 1543, 47 L.Ed.2d 792 (1976). But where, as here, a constitutional violation has been found, the remedy does not "exceed" the violation if the remedy is tailored to cure the " 'condition that offends the Constitution.' " *Milliken I*, supra [418 U.S. 717] at 738, 94 S.Ct. 3112 [at 3124] 41 L.Ed.2d 1069. (Emphasis supplied.)

The "condition" offending the Constitution is Detroit's de jure segregated school system, which was so pervasively and persistently segregated that the District Court found that the need for the educational components flowed directly from constitutional violations by both state and local officials. These specific educational remedies, although normally left to the discretion of the elected school board and professional educators, were deemed necessary to restore the victims of discriminatory conduct to the position they would have enjoyed in terms of education had these four components been provided in a nondiscriminatory manner in a school system free from pervasive de jure racial segregation.

We therefore conclude that the district court had the constitutional authority to order the continuance of the ESAA program and the implementation of the Green-Cohen recommendations if such were shown to be necessary and were tailored to cure the effects of the unconstitutional condition that had been found by the court.

## VII

It is necessary now to set out in some detail the Green-Cohen report and recommendations, as well as the testimony of the witnesses, particularly that of Dr. Green, before discussing the November 30, 1979 opinion and order of the court in which it determined that equal protection of the laws required that the ESAA program be continued and the Green-Cohen ancillary recommendations, both cognitive and behavioral, be implemented.

With respect to the Green-Cohen report, it should be said at the outset that there is every reason to believe that those who were responsible for the report were sensitive to the claims of plaintiffs and would not be likely to understate the basis for such claims. Dr. Green, as he testified, had been a witness for plaintiffs in this case at the time that the temporary and final injunctions were obtained and had been a witness for other plaintiffs in twelve to fifteen desegregation cases throughout the country. While it appears that Dr. Green and Dr. Cohen conferred about selection of staff, twenty of them came from the school with which Dr. Green is connected (Michigan State) and two came from the school with which Dr. Cohen is connected (University of Michigan). The amount of input Dr. Cohen had during the preparation of the Green-Cohen report is not clear, but Dr. Green did affirm that Dr. Cohen, who did not testify, had approved it. We mention these facts because, as will be seen, while fault was found with the way in which KBE had operated the school system from the point of view of the black minority since desegregation, there was also, the report found, much to be applauded.

While the district court granted no relief in the areas that are referred to in the Green-Cohen report as areas involving "Primary Relief," that is, (1) distribution of black students among buildings and (2) the racial composition of teachers, administrators, and supporting staff and the use and treatment of minority teachers, administrators and supporting staff, and while the district court's November 30, 1979 opinion expressly states that the issues involving such "primary relief" were not before the court, we believe that it is necessary to set out the facts in these areas as a background for considering other areas that were addressed by the district court in which extensive relief was granted.

## A

In 1970, the year before the initial desegregation order, Kalamazoo had a population of 85,661 of which 8,500 were black and 1580 were Hispanics.[6] Seventy-five percent of these black people lived in census tracts two and three, one of which was 79.8% and the other of which was 58.7% black. (Green-Cohen report at 2)

Just prior to desegregation, there were 2541 (15.9%) black and 13,412 (84.1%) white and other students in the system. There were three majority black elementary schools—Lincoln (93.7%), Northglade (82.7%), and Woodword (57.3%)—all located in census tracts two and three.[7] (Green-Cohen report at 3) At that time twenty-six other elementary schools, all of the junior high schools (five) and all of the senior high schools (two) were majority white. There were thirteen schools with less than a one percent black population (Green-Cohen report at 3).

With desegregation, approximately 60% of the student population has been provided with bus transportation for desegregation purposes. (KBE report at 212)

The Green-Cohen report contains a section entitled "An Analysis of Equity in the Distribution of Students." To the extent that the black population in a school varies more than plus or minus 15% from the percentage of black students in the system as a whole, according to the report, such represents a failure to obtain equity in distribution and the school is racially identifiable. (Green-Cohen report at 29) As to the elementary level, Green-Cohen reports that just prior to desegregation, twenty buildings deviated more than ± 15 percent and thus were racially identifiable, four being identifiably black and sixteen being identifiably white. Upon desegregation in 1971, only one elementary was so racially identifiable. By 1978–79 of the twenty-three ex-

isting elementary schools, three had been identifiably black and one identifiably white for one or more years. (Green-Cohen report at 30) The report also points out that more school buildings could be considered to be racially identifiable if the applicable test is dropped to ± 10% but that the inclusion of Hispanics, American Indians and Asians as minorities would not have a substantial effect on the identifiability of school buildings. (Green-Cohen report at 35)

Even before desegregation, according to the Green-Cohen report, none of the five junior high buildings was racially identifiable applying the ± 15% test, but by 1978–79, in spite of desegregation, one such building was racially identifiable and three other buildings would be identifiable if a ± 5% test were applied. (Green-Cohen report at 38) Moreover, prior to desegregation, neither of the two senior highs were racially identifiable, and in 1978–79 the racial composition of the high schools continues, according to Green-Cohen, "to substantially approximate the percentage of Black senior high students district-wide." (Green-Cohen at 39).

Under its "Conclusions Regarding Primary Relief—Racial Distribution of Students," Green-Cohen states only this at 289:

The Kalamazoo School District has made substantial progress in meeting the requirement of Judge Fox's order to desegregate all school buildings. While in 1970–71 there were twenty racially identifiable elementary school buildings using the ± 15 percent standard, this figure dropped to one in the year in which desegregation was implemented (1971–72). Since 1976–77, however, there has been an increase in the number of racially identifiable elementary schools; by 1978–79, there were four such schools.

---

**6.** Although the Green-Cohen report and recommendations deal with bilingual problems of Hispanics and others, these were not in any wise a subject of this litigation or the district court's opinions. Accordingly, the relief granted with respect thereto by the district court in requiring implementation of the recommendations was without any legal basis.

**7.** The district court found in its decision granting a temporary injunction that there were five majority black elementary schools at that time. 346 F.Supp. 766 (W.D.Mich.1972) at 769.

While no junior high schools were racially identifiable using the ± 15 percent standard prior to or at the onset of desegregation, since 1977–78 one school (Oakwood) has been racially identifiable. The uneven distribution of Black students in the two senior high schools prior to desegregation was eliminated in 1972–73, and neither high school has been racially identifiable since implementation of the desegregation plan.

Green-Cohen does not comment on the possibility that, to the extent the school system moved away from racial balance, this might in part be a result of the increase in percentage of black students in the system since 1970–71 (15.9%) to, in 1978–79, 30.6% and of a decrease in the overall student population. (Green-Cohen at 3 and 22). In any case, it is without dispute that all black students in the Kalamazoo school system have, since 1971–1972, attended majority white schools.

### B

Next Green-Cohen takes up "An Analysis of Equity in Employment." While we will quote below the part of the report styled "Conclusions Regarding Primary Relief— Staff Employment and Staff Assignment" we point out that, judged by labor market indicators, the system has accomplished equity so far as teachers and administrators are concerned (though it has not reached its own affirmative action goal) but has not accomplished equity with respect to employment of blacks in food services, clerical and maintenance positions.[8]

Green-Cohen concludes with respect to staff employment and assignment at 290–291:

### Staff Employment

The proportion of Blacks in the District-wide work force and within each major employee classification has increased since desegregation. According to several labor market indicators, Blacks are equitably represented in the Kalamazoo Public Schools staff except in food service, clerical, and some maintenance positions. According to the District's affirmative action goals, Blacks are not equitably represented on the Kalamazoo Public Schools staff except in administrative and custodial positions.

The District has taken recruitment measures which were designed to increase the number of applications received from Blacks. With respect to administrator applications, a substantial number have been received from Black applicants. Although the number of Black teacher applications may be reflective of the number expected, it may not be sufficiently substantial to permit the rapid achievement of the District's affirmative action goal. With respect to certain noncertificated position applications, while the number of Black applications again may reflect the number expected, the number may not be sufficiently substantial to permit the elimination of Black underrepresentation in those positions or the achievement of the District's goal.

Black applicants generally have been selected in substantial numbers and, except for administrator applicants, have been selected at equitable rates as compared to White applicants. With respect to all reasons for termination, Black employees are underrepresented among administrator terminations, but overrepresented among teacher terminations. In neither group are Blacks overrepresented among District-initiated terminations.

### Staff Assignment

The practice of assigning Black teachers and administrators disproportionately to identifiably Black buildings has been abolished, but this practice continues to some extent with Black noncertificated staff.

---

8. It is difficult to understand, and it is not explained by Green-Cohen, what "equity" in employment of a sufficient number of black persons in, for example, food service has to do with accomplishing a unitary school system.

## C

The Green-Cohen report next sets out in great detail "An Analysis of Educational Equity," and the report's recommendations in this area were ordered to be implemented by the district court.

### C-1

The first subject dealt with is that of academic course offerings, that is, whether "offerings at the elementary, junior high, and senior high levels are substantially equivalent." (Green-Cohen report at 98) The report found no substantial variations to exist as between elementary schools nor as between junior highs as to the seventh grade (Green-Cohen report at 98–99). In the eighth grade, all required courses are offered at all five junior highs. However, the report noted that South, which is 17% black, has more electives than Oakwood (42% black) and Hillside (32% black). (Green-Cohen report at 99).

The Green-Cohen report (at 100–101) then makes the following comments as to high school course offerings, which well illustrates the strict scrutiny given this school system, and summarizes its findings as to offerings as follows (omitting the footnotes):

> There are two senior high schools: Loy Norrix is 23 percent Black and Central is 25 percent Black. While the percentage of Blacks in each school is about the same, there are a few variations in their offerings. For example, Loy Norrix has an Employment-Bound Youth Program and Central does not. Other variations are more subtle and may not have any significance. For example, in the home economics area, Norrix offers a beginning clothing class and Central offers Sewing for Fun and Profit. In industrial education, Norrix offers auto body trades courses and Central offers welding trades courses, small engine repair and technical illustration. In the field of music the variations are similar—Norrix offering concert band and wind ensemble, while Central offers A band and B band. In the areas of English and social studies, some offerings are also different but comparable. For example, Central offers Black history, Civil Rights and Responsibilities, reading improvement, and acting. Norrix offers Black literature, criminal law, grammar review, and dramatics. Manual communications (finger spelling and sign language) is offered only at Norrix. The only radio broadcasting station is at Norrix. Central students are eligible to take the radio broadcasting course at Norrix, however.

> In summary, then, there are no noteworthy variations in *required* course areas currently offered in the elementary and secondary schools in the District. Elementary schools identifiable as Black* prior to the Court decision can, therefore, be said to currently offer courses which are substantially equivalent to courses offered at elementary schools which were formerly identifiable as nonminority.** In terms of the *elective* courses, however, junior high schools that have the higher percentages of Black students*** appear to be lacking courses in the language arts and creative arts areas. As Oakwood may be said to be currently identifiable as a Black school (see Chapter II of this report), this suggests inequity in terms of some course offerings between junior high schools which are racially identifiable and those which are not. No significant variations in course offerings are apparent at the high school level.

### C-2

Next, under the heading "An Analysis of Educational Equity," the Green-Cohen report takes up, with respect to junior high and high schools, the question whether blacks are over- or under-represented in classes in various course offerings. The report proceeds on the theory that if in a particular course in a school the number of black students taking the course exceeds by 15% the number of blacks in that grade in that school, blacks are over-represented in the course and if the number is less than 15% of blacks in that grade in that school, blacks are under-represented (Green-Cohen

report at 104). If blacks are over- or under-represented in a course, such is considered to be an instance of a failure to achieve educational equity.

The report states that black students have generally been substantially over-represented in reading courses in junior highs and have been under-represented during some years in some junior high schools in varying degrees in the following courses: Creative Drama, Advanced English, Public Speaking and Speech and Drama (Green-Cohen report at 105 and 106). With respect to reading, the report summarizes at 111:

> In summary, Blacks have been over-represented in the reading courses over the recent three-year period in which course enrollments were analyzed. The placement of students in the reading course is done through diagnostic testing, and the course is designed for students reading at the fifth grade level or below. Because Black students are increasingly over-represented as they advance from grades 7 to 8 to 9, this indicates that reading programs are not effecting necessary changes in the students' reading competency.

With respect to mathematics in junior high, the report concludes that black students are generally over-represented in non-accelerated courses (regular and individual math) and under-represented in accelerated math. (Green-Cohen report at 111–112 and 119)

Blacks are properly represented in social studies in junior highs and are also properly represented in science in grades seven and eight, such being required courses, but are under-represented in ninth grade science in two schools. (Green-Cohen at 123)

Blacks are greatly under-represented in junior high German, French, Latin and Spanish and are ,over-represented in a course called "Introduction to Language" in one school. (Green-Cohen report at 124–125)

Black students are properly represented in junior high typing but are generally over-represented in home economics and industrial arts. Blacks were under-represent-ed in some music courses and, at one junior high, in two art courses. (Green-Cohen report at 127–128)

With respect to black under-representation in the junior high classes, the Green-Cohen report summarizes as follows at 129:

**Section Summary**

As Table 4–2 shows, there were increases in the percentage of non-representative classes in English, reading, math, science, music and art in the junior high schools over the three years reviewed. The changes in Black enrollment in the English, reading, and math courses are of critical importance. These data indicate that Black students were placed in lower-level courses, while White students were placed in the accelerated and/or college-oriented courses. Furthermore, over the three years, this trend became more pronounced. Black students have seldom had the opportunity to take the more demanding courses and, consequently, the odds are that they will not be able to perform academically at the level .at which White students perform.

As will be seen in the section on Senior High School Enrollments which follows, these enrollment patterns continue and become even more apparent.

With respect to senior high schools, the Green-Cohen report states that black students were over-represented for some years at Central High in Communication Skills, General English, and Public Speaking and at Loy Norrix High in "Con. Comm.," Dramatics, Grammar Review, Mass Media, Publications and Reading Skills. In both schools, blacks were over-represented in Black Literature. (Green-Cohen report at 131–132) They were over-represented in reading courses at both high schools. On the other hand, at Central black students were under-represented in English Literature, World Literature, Bible as Literature, Journalism, Creative Writing, College English, Debate and Forensics, Mythology and American Novel. (Green-Cohen report at 133) At Loy Norrix High blacks were like-

wise under-represented in the literature and writing and forensics courses but also in Newspaper, Phychology of Language, Science Fiction and Yearbook. (Green-Cohen at 134)

With respect to mathematics in the high schools, Green-Cohen found that black students are over-represented in basic skill courses such as Consumer Math and are under-represented in such courses as trigonometry and statistics that are for college-bound, academically-oriented pupils. (Green-Cohen report at 137)

As to foreign languages in high schools, again blacks are under-represented in all courses except Spanish 1 and 2. (Green-Cohen report at 139)

In the high schools, black students tended to be under-represented in such science courses as chemistry, physics, and biology and over-represented in such science courses as Applied Life Science, Earth Science, Physical Science Survey and Biological Science Survey. However, by 1978–79, some improvement in such under-representation was noted. (Green-Cohen report at 141–142)

As to social science in high schools, blacks were under-represented in World History, World Geography, World Heritage, Military History, Russia & U.S.S.R. and Sociology and were over-represented in Psychology of Self, Major Events, Consumer Economics, 20th Century Events, Society Today, Home & Family, Black History, Student Government and Student Activities.

As to business courses in the high schools, black students were over-represented in some and under-represented in some. For example, at Central blacks were over-represented in stenography but were, in such course, under-represented at Loy Norrix. In business education, as between the two high schools, the report noted that there have been "marked differences between the two high schools in the representativeness of Black enrollments . . ." (Green-Cohen report at 144–145), and this last statement also applies to music courses (Green-Cohen report at 146), but the report drew no conclusion from this difference between the high schools.

Health and Safety is required and blacks and whites are properly represented but blacks are both over- and under-represented in various art courses in the two high schools. (Green-Cohen report at 147)

Black students are over-represented in some high school industrial arts courses and under-represented in others. For example, in Loy Norrix, blacks are over-represented in Architectural Drawing 3 and 4 and Woodworking and under-represented in Architectural Drawing 1 and 2, Welding and Machine Shop. (Green-Cohen report at 148–149) The report made no particular comment on the apparently unusual fact that in 1975–76 there were no blacks in Architectural Drawing 1 and 2 while, in 1978–79, black students made up 50% of the classes in Architectural Drawing 3 and 4.

Black students are generally over-represented in high schools in Home Economics and Media. (Green-Cohen report at 150–152)

The Green-Cohen report then summarizes academic course enrollments by stating that in the Kalamazoo junior and senior high schools "educational equity does not exist," summarizing as follows at 153:

### Summary of Academic Course Enrollments

It is evident from the analysis of the data, both at the junior and senior high school levels, that educational equity does not exist in the Kalamazoo public schools.

At the junior high school level, it was found that (1) a majority (10 out of 11) of the courses were non-representative in Black enrollments for 1978–79; (2) the number of courses which had representative Black enrollments decreased from 1975–76 to 1978–79; and (3) Black enrollments were higher in the lower-level non-college-bound courses (e. g., reading and individual and regular math).

The same findings were evident at the senior high school level. The only difference between the junior and senior high schools is that at the senior high school level, the extent of course segregation

has increased. For example, 20 percent of the English courses were not representative in their Black enrollments at the junior high school level in 1978–79 (Table 4–2). At the senior high school level, this figure rose to 40 percent (Table 4–4). Only 7 percent of the science courses were not representative at the junior high school level in 1978–79 (Table 4–2). At the senior high school level, however, 62 percent of the science courses at Loy Norrix and 50 percent of the science courses at Central were not representative (Table 4–4).

The pattern of racially disproportionate representation is consistent. Black students were never over-represented in the accelerated classes. They were never over-represented in College English classes, in select math classes, nor in advanced biology courses. While the District has stated that students freely make their own choices of class in which they enroll, in reality, little free choice is involved. Once a student is placed in a reading class, or in a lower-track math class, this limits other "free choices," not only at the time the decision is made, but for all subsequent school years.

As will be seen, the Green-Cohen report takes the position, as does Dr. Green in his testimony, that much of this failure to attain "educational equity" with respect to achievement in reading, English, mathematics and science and the reason why blacks are not proportionately represented in such classes is that too many blacks are placed in a slower track because errors may be made in judging the capability of black students early in their school careers, and, more importantly, blacks remain in such slower tracks because the system is not delivering effective compensatory and special education. It is also clear, however, that they are of the opinion that the system is failing to deliver "educational equity" if blacks are not proportionately represented in the classes in these areas for any reason. In this connection, KBE argues that, in the report it is damned because blacks are not achieving on the level with whites and, at the same time, because too many of them are in compensatory education classes.

## C–3

The next subject discussed in the Green-Cohen report under the general heading "An Analysis of Educational Equity" is a discussion of "Variations in Educational Offerings and Procedures."

Although there occasionally may be racially unbalanced groupings within classrooms, the report found no evidence in elementary schools of within-school classroom segregation. (Green-Cohen report at 157) We interpret this to mean that within a particular school, in assigning students to classes in, say, the same third grade arithmetic, there is no tendency to have blacks over- or under-represented in these classes. This is also true in secondary schools, in non-tracked, regular courses. (Green-Cohen report at 157)

In an effort to determine why black students are disproportionately represented in certain courses, Green-Cohen interviewed principals and counselors at the schools and summarized the conclusions from such interviews as follows at 166–167:

The results of the principal and counselor interviews suggest that placement in classes is a function of prior student achievement in a subject area. An average of 58 percent of the respondents specified student "ability" as a factor underlying class assignment. If achievement is an index of ability and placement is a function of ability, then it is not surprising that the enrollment in lower level junior high school mathematics and reading is disproportionately Black, since many Black students enter junior high school with poor achievement in reading and mathematics skills. (See MAT results cited in the section on performance in this chapter.)

A comparison of the District seventh grade placement criteria with the criteria listed in the responses given in the interviews with the sixth grade teacher-counselors indicates that both sets of criteria are in accord. The interview data show, however, that over half of these teacher

respondents sometimes varied from the criteria in actual practice. Other criteria used by the teacher-counselors were student motivation and work habits.

In the interviews, the main reasons these teachers gave for poor Black student achievement were the following: lack of parental support, economic and environmental factors, less ability and low language skills, and a limited range of experiences. Since the sample of teachers who gave these reasons is random, the responses may be taken as indicative of attitudes that sixth grade teacher-counselors have about Black student achievement.

The Green-Cohen report (at 167–168) discusses student attendance, stating correctly: "If students are not attending school, they do not have an opportunity to learn." Seven elementary principals who were interviewed saw no racial differences as to school absences. With respect to high schools, the Green-Cohen report (at 168) found absences from school were racially proportional at Loy Norrix but that "student absences at Central High School appear to indicate a trend of racial disproportionality." The report does not speculate as to why there would be this difference in rate of absences at the two high schools.

The Green-Cohen report next, still dealing with "educational equity," discusses student performance and retentions, and reaches the conclusion that black students, on the average, are not achieving as well, particularly in reading and mathematics, as white students, and as has been seen, this results in their, in disproportionate numbers, being placed in classes teaching basic skills as distinguished from college bound, academic-oriented courses. As to this disparity in average achievement, Green-Cohen stated at 169–170:

### Student Performance and Retentions

The degree of equity in education can also be assessed by considering the outcomes of the educational program. In order to do this, analyses of Metropolitan Achievement Test Scores were carried out in grades 2 through 9 for reading and mathematics, and in grades 5 through 9 for science and social studies for the years 1975–76 through 1977–78. Figures 4–14 through 4–25 depict performance in each of these areas for each year as a function of grade level, grade equivalent unit level, and racial group (majority students, minority students). As can be seen from these figures, the gap in grade equivalent unit level increased between majority and minority students as a function of grade level, for each subject tested within each cited year. For example, a gap of one-half year in math for the second grade widened to two years for the ninth grade, while a gap of one-half year in reading for the second grade widened to almost three years for the ninth grade. This would indicate that there was a decided discrepancy in the level of achievement between majority and minority students and that this difference increased as students moved through the school system.

*    *    *    *    *    *

As can be seen from Table 4–7, at the early elementary school level for the years indicated, the percentage of early elementary school Blacks who were retained was about three times as high as the percentage of early elementary school Whites who were retained. At the later elementary level, this ratio varied between two to one and three to one. Also, the figures in Table 4–6 show that there was about a 15 percent to 20 percent difference between the percentages of the total retained students who are Black and the percentages of Black students at each of these elementary school levels, for each of the years being considered. From this table, then, it is evident that Black (as well as Spanish-surname students) were disproportionately retained at each school level for these years. This is a further indication of the disparity in achievement between Black and White students and evidence that this disparity appears early in the educational system.

The Green-Cohen report further states at 294:

## Remediation Programs

Placement in a compensatory education program begins at the elementary school level. These programs are disproportionately Black in their enrollments. Student equity of academic performance is not an outcome of these programs; rather than gaining and overcoming their disadvantages, a large proportion of these students are falling further behind each year. These programs help to lay the foundation for differentiation in course enrollments in secondary schools.

As will be seen, this disparity in achievement between black students and white students on the average is at the heart of this lawsuit, and the district court ultimately concludes that the reason for this phenomenon is that black students have been denied equal protection of the laws.

The Green-Cohen report (at 185), in introducing its discussion of the compensatory education program in the Kalamazoo schools, as part of its discussion of "educational equity," makes the following comment:

## Compensatory Education

Evidence related to equity of educational development can also be obtained by reviewing (a) enrollments in special programs to determine if they are racially disproportionate and (b) outcomes of those programs to determine if they result in student equity.

The report concludes (at 185) that blacks are disproportionately represented in "ESEA I Title I enrollments for compensatory education . . ."[9] For this purpose the majority of students are compared with blacks, and the majority is defined to include "Whites and students who are neither Blacks, Native Americans, Orientals, or [sic] Spanish [sic]." (Green-Cohen report footnote at 186.)

As we have stated, the Green-Cohen report takes the position that black students on the average are not achieving in certain areas as well as white students partly because the compensatory education program is not being properly directed. It also contends, however, that the very fact that black students are over-represented in compensatory education is itself a failure to deliver educational equity.

The Green-Cohen report (at 190) finds some "racial disproportionality in the secondary school reading classes . . ." and then "overall, Black students were not achieving on a par with White students in reading. This finding raises questions concerning the benefits of reading classes."

The Green-Cohen report (at 191) discusses the bilingual program (in Persian, Vietnamese, Spanish and Arabic), which apparently is carried out through "tutorial sessions offered students . . . in either individual or group form." The report states that changes in the program being required by the Office for Civil Rights may result in resegregation of bilingual students. In any case, as we pointed out (footnote 6), the problems in the bilingual area have not been a subject of this litigation and the district court had no legal basis for implementing recommendations in this area.

The Green-Cohen report next takes up (at 193–197) the special education program and investigates whether blacks were over-represented in classes for Emotionally and Mentally Impaired (EMI), Emotionally Impaired (EI) and Learning Disabled (LD). It found that blacks were not over-represented in the early elementary level but were over-represented in the later elementary level in EMI for four years and in LD for two years since 1971. It also found blacks over-represented in EMI and EI classes in junior high, and this "racial disproportionality" is also true in the high schools.

### C-4

The Green-Cohen report also discusses extra-curricular activities under the general heading of "An Analysis of Educational Equity." It initially notes some difference in

---

**9.** The program referred to in the record as "ESEA Title I" is a federal program providing money for compensatory education but is separate and different from ESAA, heretofore and hereafter discussed.

the extra-curricular offerings in the elementary, junior, and high schools (at 199–203) and notes considerable racial disparity in participation in various athletic and other activities (at 204–214) and then evaluates the process by which students become involved in extra-curricular activities as follows (at 215–216):

There appeared to be no overt racial differences in these schools in the processes for selecting participants in extracurricular activities. This conclusion could be misleading, however. For example, in the student government organizations, selection was on the basis of student voting. Racial differences could occur if there was a racial imbalance in the schools or in particular classrooms. In activities where the teachers and principals selected the participants, racial differences could also be a reflection of the attitudes and biases of the selectors. This same logic holds true for those activities where selection was based on judging by a group or committee. The existence of any relationship between biases in attitudes and selection processes cannot be documented, however, with any of the available data. In most of the activities, the selection process was reported by the District to be one of voluntary participation at the elementary level.

Participation in extracurricular activities in secondary schools is also chiefly voluntary. An exception is athletic teams, where the coaches select the team members. The criteria for the selection of members on an athletic team are set forth in *Team Regulations for Players*, September, 1976, and *Athletic Eligibility Procedures*, November, 1978. None of these criteria is racially identifiable.

\*   \*   \*   \*   \*   \*

At the junior high and high school levels, while there appeared to be no overt racial differences in the state District processes for selecting participants in extracurricular activities, it is misleading to conclude that the selection processes were always equitable, given the trend of racial imbalance in several activities over

the year—e. g., basketball, baseball, debating, choir, golf at Loy Norrix (see Table 4–14). Although it is said that in athletic activities, selection is based on state eligibility rules which are standard for all participants, and while participation in most other extracurricular activities is voluntary, questions can still be raised regarding the real selection policies that guide students participation in extracurricular activities.

**C–5**

Next, again under the general heading of "An Analysis of Educational Equity," the Green-Cohen report takes up "Teacher Goals, Objectives, and Expectations." The Green-Cohen staff, for this purpose, interviewed a random sample of teachers which produced the following results (Green-Cohen report at 216–217).

With respect to elementary school teachers, 54% said they had the same goals for all and 43% said they had different goals for some, and, of the later group, 67% said that their goals varied as a function of the students' work. These students were identified as having problems in the home, differing abilities, or attitude or behavioral problems. All said that the district provided them with goals in reading, mathematics, science, and social studies and 89% said they followed the goals. Ninety-six percent of the teachers grouped their students in the classrooms, with 61% grouping in accordance with performance and 36% by ability. The Green-Cohen staff interpreted performance and ability to be essentially the same "since ability can be inferred from performance as judged by some type of test or standard." (Green-Cohen report at 218–219)

Further, 74% of the junior high and 76% of the senior high teachers said they had the same goals for all students. Of the junior high teachers who had different goals, most of them said the reason was the difference in skills of the students. Also, 50% of the junior high teachers having different goals said that special education students (EMI, EI and LD, *supra*) received

different objectives. (Green-Cohen report at 219–220) Ninety-six percent of the junior high but only 48% of the senior high teachers said that the system provided them with specific goals for the subjects they taught. The goals of 87% of the junior high and 80% of the senior high were the same as the district's goals. As to ability grouping, 83% of the junior high and 66% of the senior high teachers did not group students by ability. Those who did group by ability gave as a reason their performance on MAT tests and reading levels. No racial differences were reported in these areas. (Green-Cohen report at 220–221)

Lastly, most teachers reported no within-class ability grouping, but Green-Cohen warned that: "it should be remembered, as noted in the section on course enrollments, that students have already been tracked into different classes on the basis of prior performance or judgments about presumed ability." (Green-Cohen at 221) From this last, we deduce that the ability grouping referred to in the preceding two paragraphs refers to the grouping of students who are taking the same subject for assignment to classes.

Goals for compensatory education were next discussed. Questions were asked of a sample of regular classroom teachers. As to elementary teachers, 14% reported that compensatory education is carried out in the classroom, 54% said the students were sent out for this purpose, and 32% said they do both. Forty-six percent said they had the same objectives for such students, and those who did not gave as reasons differing abilities, skills and motor development. (Green-Cohen report at 222–223)

As to placement in compensatory education in elementary and junior high, the following reasons were given: teacher recommendations, MAT scores, or being at least one grade level below the acceptable level, and all reported that there were no racial differences in the application of placement criteria. Fifty percent of the teachers said that the district provided specific objectives for such students and 75% of these said the objectives were the same for compensatory and non-compensatory students. Most teachers said that the goals for compensatory education students and the district's goals were the same, individual needs and difference in ability levels being reasons for this. Seventy-five percent said there were no identifiable groups for which there were different goals, and all teachers said the same criteria were applied regardless of race in removing from the compensatory education program, the criteria being passing tests and "being not less [sic] than a year below grade level . . ." (Green-Cohen report at 224–225)

The goals and objectives for special education students, as reflected by teacher answers, seemed in general to parallel their answers with respect to compensatory education students. (Green-Cohen report at 226–232)

With respect to teacher expectations as to regular, compensatory and special education students, we will simply quote herewith the Green-Cohen report summary (at 238):

**Section Summary**

Based upon the interview responses, it can be said that the expectations of teachers appear to differ as a function of the type of student being taught. At least half of the regular classroom teachers said they expected 80 percent or more of their students to master their goals and objectives, while only about 13 percent of these teachers expected 80 percent or more of the compensatory education students to master the goals and objectives of regular classroom students. About half of the compensatory education teachers expected 80 percent or more of their students to master the objectives set for other students, while about 64 percent of the special education teachers had similar expectations for their students.

About 17 percent of the regular classroom teachers said Blacks were less likely to master the goals and objectives which they set for their students.

Although more than half of the compensatory education teachers who were interviewed said they expected between

one and two years' growth in their students' achievement, analyses of the compensatory education outcome data (see the section in this chapter) indicate that these expectations have not been met. Three-fourths of the elementary special education teachers and 36 percent of the secondary special education teachers expected less than a year's growth in their students' achievement. Given these expectations, it is not surprising that about half of the compensatory education teachers and all of the special education teachers report that the average stay of the students in their program is at least two years.

Since participation in compensatory education and special education programs is disproportionately Black, the results of these interviews indicate that, for many Blacks, mastery of the material and movement out of the special programs are expectations that their teachers do not hold.

With respect to teacher in-service programs, the Green-Cohen report concluded (at 241) that since only "minimal data" were available, the contributions of such programs to the "attainment of student equity cannot be adequately assessed." The report cautioned, however, that the available data "provide little evidence that there has been a concerted effort on the part of the District to conduct a program of District-wide workshops in the area of desegregation and racial relations." (at 242)

## D

The next general heading in the Green-Cohen report is "An Analysis of Opportunities for Equity in Social and Psychological Development." The district court also approved the Green-Cohen recommendations and granted relief in this area.

## D–1

The Kalamazoo school system has provided guidance and counseling services in its junior and senior highs, and the counselors are concerned with educational, social, emotional and occupational growth and development of each student. (Green-Cohen report at 248) There have been a total of thirteen such counselors in the five junior highs and twelve in the two high schools (at 250). The report (at 254) draws the following conclusion with respect to such counselors:

According to the results of the counselor interviews, then, the goals or purposes of the counselors are in line with the stated goals of the District. There is a lack of consensus, however, as to whether there are counseling guidelines, as well as to who is responsible for establishing those guidelines. This lack of consensus could contribute to a lack of uniformity in counseling practices within the District. Also, more than half of the responses given by the counselors affirmed that many of the students' social problems were racially identifiable, with about one-quarter of the junior high counselors stating that they saw more minority students for personal counseling than White students. While there is no evidence, based on the District responses or the interviews, that the processes followed by counselors in personal counseling are differentiated along the lines of race, it is the perception of counselors that many Black students are experiencing personal/social problems.

With respect to discipline, the policy of the school system is based on the belief "that reasonable behavior should be the goal for each student. A student may be suspended or expelled if school personnel feel that it is in the better interest of the student population and the student himself." (Green-Cohen report at 255) With respect to suspensions, the report found that proportionately more blacks were disciplined but does not state that the system's Code of Conduct is not administered in a fair and even-handed way. (Green-Cohen report at 259 and 295)

The report next takes up dropouts and states that, in addition to suspensions, the rate of dropouts provides "another index of equity in the area of social development . . . ." (at 259) Although the report states

(at 262 and 295) that minority dropouts are out of proportion to their numbers in the system, it was brought out on cross-examination of Dr. Green (App. at 371A *et seq.*) that, according to the Green-Cohen report (at 263), the proportion of dropouts to their numbers in the system in 1977–78 as between minority and non-minority was almost the same, and we note that this was also approximately true in 1976–77 since in that year only 24.4% of the total dropouts were minority students. Moreover, in 1975–76, minority students made up only 28.6% of the total dropouts in the system, again close to the percentage of minority students in the system.

Under a heading of "Conclusions" with respect to "opportunities for equity in social and psychological development," the Green-Cohen report states in part as follows at 279–280:

2. **Code of Student conduct:** There is a published code of student conduct in the Kalamazoo School District. However, because of the above-cited disproportionately high rate of Black suspensions and dropouts, a question must be raised regarding adherence to the standards of the code. Perhaps the personnel responsible for administering disciplinary actions are unaware of the standards, and hence inequities occur. In any event, the code should be reviewed and after appropriate modifications, it should be disseminated to all students and teachers, as well as to all other personnel involved in handling discipline problems. When discrepancies such as those noted occur, measures should be taken to find an effective remedy.

3. **Disciplinary procedures:** There is a published uniform discipline policy. However, the findings included the following: at three of the five junior high schools and at one of the two senior high schools, there were disproportionate Black suspension rates for Category I offenses; and at all seven schools, there were disproportionate Black suspension rates for the more serious Category II offenses. Furthermore, at all seven schools, there was a higher percentage of minority, as compared to majority, dropouts.

While 20 alternatives to suspension, 19 programs to prevent dropouts, and at least six inservice programs relating to discipline were conducted over the past few years, none seems to have had any noticeable effect on the disproportionate rates.

Furthermore, no evaluation data were provided. Therefore, no conclusions can be reached regarding the impact that these programs had on Black or White students.

**E**

The Green-Cohen report (at 281) contains a chapter on "Perceptions of Community Leaders Regarding The Desegregation Effort." To obtain this information on such perceptions the Green-Cohen staff interviewed ten persons, six white and four black, nine of whom were male and one of whom was a black female. "These persons included past and present leaders of the NAACP, past and present school board members, a leading local journalist, a member of the financial community, a school official, two clergymen, and a community agency worker." (Green-Cohen report at 282) The report does not quote any of the leaders but states (at 286) that "the opinions of the leaders were consistent with the findings of this report," to wit (1) "the schools have made substantial progress toward racial balance at the building level (with the exception of four elementary schools and one junior high school, as noted earlier)"; (2) that the "schools cannot be considered to be desegregated, in view of disproportionate racial enrollments in certain academic areas"; and (3) "the inservice training which has been provided for school personnel has not been adequate to insure maximum educational benefits for all students."

While the Green-Cohen report indicates that some in the Kalamazoo community question the wisdom of the court-ordered desegregation plan that has been in effect

since 1971 (at 283), it also makes clear that, as a community, Kalamazoo has cooperated in an effort to make the plan work, stating at 11:

The implementation of the Court-ordered busing was essentially uneventful, with many volunteer parent groups involved in insuring a smooth transition. A financial problem resulted from the increased cost of busing and the increased number of students to be bused. This was resolved by obtaining a special legislative permission for an additional school millage election which was passed by the Kalamazoo voters.

**F**

The Green-Cohen report (at 298) contains an overall summary of its conclusions as follows:

### Summary

The Kalamazoo Public School District has made substantial progress in moving from a dual educational system toward a unitary system.

This process will not be completed, however, until three major goals have been achieved:

1. The District must take steps to end the racial identifiability of the four elementary schools and one junior high school found to exceed the ±15 percent deviation with respect to racial balance.

2. The District must take steps to remove evidence of racial identifiability in various academic programs where resegregation within buildings has occurred.

3. The District must take steps to achieve equity in achievement outcomes for all students—White, Black, and other racial minorities. Currently there is no evidence that past academic programs have resulted in a decrease in the achievement outcome disparity between Black and White students. Indeed, this disparity from 1970–71 through 1978–79 has increased.

Recommendations, both administrative and academic in nature, will now be presented. If implemented, these recommendations should move the system toward unity status.

The Green-Cohen report (at 299) listed the areas in which it was making recommendations for action. These included "racial distribution of students among buildings" and "staff employment practices," but the district court, as we have before stated, granted no relief in these areas at this time. The areas listed in the report as to which relief was granted are:

"3. Curricula (academic programs).

4. Class absences, retentions, suspensions and dropouts.

5. Extracurricular activities.

6. Inservice Training.

7. Program monitoring.

8. Community relations."

**G**

Before outlining the recommendations of the Green-Cohen report which the district court ordered implemented, we will first discuss the extensive testimony of Dr. Green.

Dr. Green was of the opinion that, with respect to attaining unitary status in pupil assignment, while the district had made "tremendous strides," it never had reached such status since, applying the ±15% test, one school remained segregated after the court's desegregation order and four schools were segregated in 1979–80 (App. 276A–277A).

Dr. Green felt that not enough had been done, in order to acquire unitary status, in an effort to reduce suspension and dropouts and to furnish support services primarily in reading and math (App. 277A).

Dr. Green believed that there were "some efforts to bring about a change in teacher attitudes through in-service training, that that effort was not direct and intensive enough.... We also felt that in-service training [should] be directed not just at teachers but administrators, clerical staff, supportive staff, general maintenance workers, janitors in the school, bus drivers,

teacher aids; that that in-service training should be systematically rigorous and intensive from top to bottom; bottom up, top to bottom." (App. at 278A) He believed that in-service training should be of "long duration" (App. at 303A), should include even "cafeteria workers" and "crossing guards," (App. 311A) and would be the most expensive part of the programs he was recommending. (App. at 318A)

Dr. Green indicated that, due to lack of in-service training of teachers, a disproportionate number of black students were being assigned to special education classes. (App. at 280A) He further recommended as follows (App. at 284–285A):

> That youngsters be mainstreamed as quickly as possible beginning at the elementary-school level and provided with the necessary social-psychological support as well as actual cognitive support in order to become effective students.

> In mainstreaming programs it's our feeling that when young people are trapped or are placed in special programs, that these special programs themselves sometimes would reinforce and contribute to their lack of academic achievement.

> So, in the very beginning we recommended that that district begin an effort, make an effort to begin a program to systematically move these, to merge special programs with regular mainstream programs in order that youngsters who have historically lagged behind could pass and can catch up and become a part of the regular instructional process.

Dr. Green believed that a person experienced in education and desegregation should be employed from three to five years, with approval of the court, to monitor "the effectiveness of programs structured by the district to facilitate the achievement of unitary status" and report to KBE and the court regularly. (App. 287A–288A) He thought that, while Kalamazoo has been a very exceptional communi-

ty in terms of its overt acceptance of desegregation," he also thought that a "blue-ribbon" citizens committee should be formed "to provide support to the superintendent and to the school board in their efforts to achieve full unitary status." (App. 288A–289A) He was not asked about and did not comment on the fact that the number of active Parent Teacher Organizations in Kalamazoo decreased from thirty-one in 1972 to sixteen in 1976. (KBE report at 132)

Dr. Green reached the conclusion that the ancillary cognitive and behavioral programs heretofore funded by ESAA had not been successful in "closing the gap" between white and black achievement but employees whose salaries were funded by ESAA should be kept to aid in carrying out the programs he was recommending. (App. 290A–292A) He thought that it is highly doubtful whether the ESAA programs have been of any value at all. (App. at 355A) He believed that if his ideas as to "mainstreaming" underachieving students as quickly as possible is adopted, this will cause a "systematic decline in the dropout rate" (App. 336A), and that his "mainstreaming" ideas have worked effectively in the school system at Lansing, Michigan (App. 337A–338A).[10]

After plaintiffs' counsel developed from Dr. Green that the suspension rates of black students is substantially higher than that of white students, Dr. Green testified, in response to counsel's suggestion, that such difference was a result of the prior dual system, or could be a result of tracking, teacher bias towards students "who were in the past victims of the dual system," underachievement of black students, and frustration of teachers (App. 396A–399A).

**H**

In the order entered by the district court on November 30, 1979, it was provided that: "In September 1980 the District is to imple-

---

**10.** However, at grades 4 and 7, the Kalamazoo students *tested higher in 1978 than did Lansing* students in math and reading tests administered by the State Department of Education

(SBE Exhs. 11 and 12), but the black-white *ratio in the Lansing tests was not shown in the* reports.

ment the recommendations listed on pages 306–316 of the Green-Cohen report," and it was further provided, as we have heretofore noted, that KBE must file a plan of programs by February 15, 1980 to carry out the recommendations.

We will only outline these recommendations in the Green-Cohen report herein but will attach as an appendix hereto a copy of such recommendations.

With respect to academic programs, the report (at 306) notes the "racial segregation in such critical areas as reading, language development, and mathematics, as well as compensatory education and special education" and that this "leads to the conclusion that the District must begin immediately to demonstrate greater commitment to the task of providing equitable educational programs for all students." The report then recommends that KBE adopt common goals for all students in each grade to be established by a school district working committee and such expectations be distributed to teachers and counselors and reviewed each year. It recommends that more emphasis be placed in basic skills such as reading, language and mathematics and that instructional programs be provided for "minority students who have been the victims of inequitable and segregated instructional programs, so that they will master the goals and objectives considered appropriate for majority students." Student progress should be monitored from the beginning and learning problems "should be corrected immediately." (Green-Cohen report at 307–308) Tracking should be reexamined with a view towards abolishing it, and students in lower level or remediation programs should be mainstreamed as soon as possible. "For example, students in reading classes should be mainstreamed into English classes, while students in individualized or tutored mathematics should be mainstreamed into upper-level mathematics." (Green-Cohen report at 308) An examination of the testing program should be made as to its reliability and possible bias "to determine whether or not aptitude and achievement testing contributes to racial disproportionality in academic programs." (Green-Cohen report at

309) Compensatory education should be administered to students in regular classrooms, an effort should be made to reduce the number receiving special education by mainstreaming them, and that monitoring of bilingual and "'gifted' programs should occur so that they do not become and remain separate and segregated entities." (Green-Cohen report at 310)

"Racial disproportionality with regard to high school class absences, elementary school retentions, and high school suspensions and dropouts has been present in the Kalamazoo school system." (Green-Cohen report at 311) It is recommended that special attention be paid to these problems and that: "Every effort should be made to increase the minority students' chances of academic success and involve them more fully in the academic process of schooling." (Green-Cohen report at 311) The discipline code should be well known and understood and followed carefully, "with monitoring of suspensions of minority students and reasons for suspensions." (Green-Cohen report at 311) The Superintendent and staff should assume direct responsibility for decreasing dropout and suspension rates (at 311).

With respect to extra-curricular activities, all students should have the opportunity and be encouraged to participate in such activities, and it should be made known to them that they "can succeed in these activities." The same activities should be offered at all schools at each level, and lack of equipment, prior low participation or distance should not be barriers. (Green-Cohen report at 312)

An intensive in-service training program should be adopted for all administrators, teachers, counselors and other personnel. These should be used to clarify common goals for teachers, show them how to accomplish these goals, improve teacher attitudes, and help them to improve student motivation "as teachers need to understand the dynamics of school success for all students." (Green-Cohen report at 313) The in-service training should be carried out by

educators with desegregation experience (at 313). Counselors should be given guidelines and training sessions in these in-service programs, and administrators should participate in workshops to familiarize them with goals of desegregation, legal aspects, and how to "mobilize a district to desegregate ..." (Green-Cohen report at 314) "Strong consideration" should be given to in-service programs for parents and students to enhance their ability to "function successfully without racial considerations." (at 314)

A monitor should be appointed with the sole duty of overseeing and reporting on the desegregation program, and "[the monitor] should be a highly trained person in the field of education, should have had teaching and/or administrative experience, and should be knowledgeable about the educational desegregation process." (Green-Cohen report at 315)

In order to continue to avoid the "turmoil and violence that occurred in Pontiac, Michigan and Boston, Massachusetts," a community-wide citizens committee should be established by the elected KBE to receive reports from the district on the progress of desegregation and work with the court-approved monitor. (Green-Cohen report at 316)

## VIII

As stated, the district court held a concurrent hearing on the question whether the Green-Cohen recommendations would be implemented and the question whether the ESAA program would be continued and the State of Michigan would be required to pay for it in 1979–80, and the district court held that the ESAA program would be continued and the state would pay. As we have also stated, the implementation of the Green-Cohen recommendations and the continuance of the ESAA program raise one common and overriding issue, which is whether equal protection requires that such be done. We will, therefore, outline the background and content of the ESAA program as well as the termination of its funding by the federal government.

As KBE had been directed to do by the district court, it applied to the federal government and received ESAA funds, and these funds have been used over the years to beef up the system in aid of the desegregation program. KBE has also added to these funds from its operational budget. Since 1973, the following sums have been obtained and spent on these ESAA programs:

|  | ESAA FUNDS | OPERATIONAL FUNDS |
|---|---|---|
| 1973–74 | $ 459,000 | $ 29,753 |
| 1974–75 | 1,070,881 | 41,521 |
| 1975–76 | 1,003,373 | 64,847 |
| 1976–77 | 702,340 | 112,915 |
| 1977–78 | 548,493 | 207,346 |
| 1978–79 | 590,065 | 233,446 |

KBE was turned down by the federal government when it applied for ESAA funds for 1979–80, the application being graded on a point system based on quality of programs and quantity of minority population in the system. (App. 96A) Also, other school systems which were applying for the first time got additional points for this. (App. 97A) In the year that Kalamazoo was turned down, Detroit, Pontiac and Lansing received ESAA funds because they demonstrated more need for funds. (App. at 98A) KBE resubmitted its request for ESAA funds for 1979–80, this time emphasizing behavioral programs over cognitive programs but was again turned down. KBE then sought to obtain replacement of ESAA funds from the state legislature but was turned down because Kalamazoo had the seventeenth highest general fund expenditure per pupil of the 532 school districts in Michigan. (App. 38A et seq.) The average general fund expenditure per pupil in Michigan is $1,588.29 whereas such expenditure per pupil in Kalamazoo (which did not include ESAA funds) was $2,121.66. (App. 39–46)

A large part of the ESAA program has been under the direction of Judith Johnson who has the title of "Executive Director of Instructional Services" in the Kalamazoo school system. According to her vita (KBE Exh. 11), Ms. Johnson is fifty-two years old,

black, has a B.A. from Hillsdale College and an M.A. from Western Michigan University and has been in the Kalamazoo system since 1962.

Ms. Johnson helped select the consultants for secondary instruction who were under her supervision, of whom there were nine. (App. 183A, 800A) They were "master teachers" who were given supervisory authority over classroom teachers and they were "responsible to really intervene with teachers on classroom management." They worked with staff on curriculum, academic expectation, course plans for students and dissemination of test data. These consultants supervised students who performed peer tutoring and provided such tutoring services for students who needed it. These consultants also provided in-service training for achievement motivation, classroom management and "values classification." (App. 182A et seq.) These consultants—one in each junior high and two in each high school—had the status of administrator (App. at 185A) and are the "interventionists" in carrying out the desegregation program (App. 202A). They also administered the cultural heritage and awareness centers in the buildings. (App. at 186A)

The peer tutors were paid from ESAA funds or by receiving school credit. In one senior high there was a language center and a math center and in the other a reading center and a math center. Peer tutors, under the direction of the consultants, helped the students who came to the centers. (App. 187A–188A)

The consultants watch out for discrimination "covert and overt" and orient substitute teachers "into a desegregated school environment" (App. 190A) and prevent any segregation in the classrooms (App. 192A). These consultants also administer the mobile teaching unit which was tutorial for reading and math. (App. 197A)

Ms. Johnson also supervised a program developer who "is the person responsible, directly is my right arm into the curriculum to coordinate the academic specialists who are curriculum people, monitoring all textual material and all supplementary materi-

als, and every material that is written for the aspect of the instructional activity." (App. at 201A) The developer, again, was Ms. Johnson's "right arm" in coordinating and monitoring the seven academic specialists who have responsibility for curriculum areas, and the developer monitors all materials and the curriculum for "racism and sexism" and makes sure all "ethnicisms" are represented in the program. (App. at 202A–203A) The developer also deals with extra-curricular academic activity, and Ms. Johnson, in addition, supervises a coordinator for physical education. (App. 205A) In academic · extra-curricular activity, Ms. Johnson's program developer coordinated such activities as quiz bowl, forensic festival and science fair (App. 205A–206A), and when those participating in the quiz bowl were not representative racially and sexually of the school population, Ms. Johnson told them that it would be representative or there would be no quiz bowl. (App. at 208A)

Ms. Johnson provided information to the Green-Cohen staff and, in spite of all her activities and the efforts of those whom she supervised on the cognitive side of the ESAA programs, the disparity in achievement between black students and white students, in her opinion, is still wide, and she would not disagree with the Green-Cohen report in stating that such disparity has actually increased since the district court ordered desegregation of the system in 1971. (App. 257A)

Having covered what has been referred to in the record as the "cognitive" side of the ESAA effort, we turn to the other side—the behavioral side—of this effort. This has been under the direction of L. Henry Goodwyn who had the title of "Director of Student Services." His vita was not supplied, but he testified that he attended Virginia State, graduated from Drake, received a masters from the University of Wisconsin and has also attended Beloit, Michigan State, Western Michigan, and the University of Michigan. He has been a principal of an elementary and a high school, and he had been in the Kalamazoo system twenty years. (App. 437A)

Under Mr. Goodwyn's direction were seven student service leaders (not to be confused with the counselors heretofore discussed), one at each junior high and high school. They served as liaison between home and school and as advocates for the students. (App. 441A) These student service leaders try to head off suspensions and try to prevent a recurrence of them. They also work on dropouts, trying to prevent them by finding jobs that allow continuance in school, try to change schedules if a potential dropout has a problem with a particular teacher, and also work with parents and ministers to prevent dropouts. (App. 441A *et seq.*) The student service leader seeks to keep down racial tension, and the leader's office is physically separate from the principal's to encourage students to go there with their problems. (App. 44A *et seq.*)

## IX

■■ As stated, the district court ordered the continuation of the ESAA program with funding by the State of Michigan and implementation of all of the recommendations of the Green-Cohen report with respect to ancillary programs. (App. 19A–45A)

The opinion states that a district court does not have plenary power to intrude into the affairs of a school district simply because it has educational problems, citing *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), and that it has the power to restructure the operations of such districts only to remedy constitutional violations that they have committed, citing *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*), and *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). (App. 33A) The court noted that this principle "applies in situations like that now before the court where a violation was found many years ago." It further noted that its power rested on a finding of either new constitutional violations or the presence of old violations that have not been remedied, citing, *inter alia, Brown v. Board*

*of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). (App. 34A)

The opinion of the district court then states (App. 34A): "If this court finds that the instant defendants have remedied their prior constitutional violations and achieved unitary status, then no further remedial orders can be made. *Pasadena City Board of Education, supra.* If it is found, however, that the school system is not unitary and still suffers from the effects of defendants' violations, then this court may order further remedial relief which is tailored to the scope of the existing violation; this might require the present ESAA programs continued, that the recommendations of the Green-Cohen report be used, or that some other remedy be adopted." (App. 34A) And the opinion further states: "Defendants had the burden of proving that a unitary system has been established. To meet this they had to prove that their constitutional violations and the effect of these violations had been remedied." (App. 34A)

While the opinion of the district court deals again with the burden of proof in more detail, we pause here to point out that the district court did not have before it the question whether KBE had complied with its 1971 and 1973 orders with respect to desegregation of the system and assumed for purposes of the opinion that such had been done. (App. 34A) Further, the district court did not find that the defendants had failed to comply with the other facet of its 1973 order, which was to cooperate to obtain additional funds for the Kalamazoo system from the federal government and the State of Michigan. The question before the district court that is now being reviewed was whether the desegregation plan that had been in effect since 1971 should be modified or altered by requiring the implementation of the extensive and expensive Green-Cohen recommendations as well as by requiring the continuation of the ESAA program. And while the 1973 order, after retaining jurisdiction, provides that any party may move to alter or amend the plan, it also provides that the party so moving would have the "burden of justifying

changes." 368 F.Supp. 143, 205. Thus it would appear that, by virtue of the terms of such order if for no other reason, the burden should have been on the plaintiffs with respect to proving the constitutional necessity for implementation of the Green-Cohen recommendations and on KBE with respect to showing the constitutional necessity for continuation of the ESAA program and that SBE was entitled to rely on this proposition.

It is somewhat difficult to pin down precisely the factual findings and the legal conclusions on which the district court relied in granting the broad relief here. We will, however, attempt to dissect and deal with them, but not necessarily in the order in which they appear in the opinion.

At the outset we point out that the Green-Cohen report takes the view that black students are not receiving "educational equity" and the school system is not unitary if there is, *for any reason*, disparity between the achievement of black students on the average and white students on the average. We do not read the district court's opinion to adopt this view, and counsel for plaintiffs disavowed such a contention at argument.

As we have heretofore indicated, the disparity between the achievement of black students and white students is at the heart of the lawsuit and although the district court in part solves the problem of determining whether such is related to past constitutional violations by its allocation of the burden of proof, it finds that plaintiffs-appellees have affirmatively proven at least two existing constitutional violations. One of these violations has to do with the failure of the system to maintain proportional representation of black students in academic and extra-curricular activities, and the other has to do with the failure of the system to maintain sufficient in-service training for its teachers and staff.

The Green-Cohen report, as has been seen, is of the view that black students are not receiving "educational equity" and the system is not unitary if black students are over- or under-represented in various academic courses and extra-curricular activities and that this is true even though there is no intent to discriminate on the part of school authorities and even though such condition is not related to any past or present constitutional violation. In other words, the view is that even if this condition results from the desires and interests of black students or from giving them special instruction (but the necessity for special instruction is unrelated to any constitutional violation), it is inconsistent with a unitary system. Put still another way, the contention is that equal protection requires desegregation within the school in the same way that it requires desegregation among schools. The district court agrees with this proposition (App. 38A–39A) and cites *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), in support of its holding. That case does not so hold, we know of no other case that so holds, and we disagree with this legal proposition.

The other affirmative determination of a constitutional violation was based by the district court on a finding that there had not been sufficient in-service training of teachers or staff. In this connection, the district court said, *inter alia*, (App. at 38A):

> Another reason exists for finding that the effects of defendants' violations are still affecting the District's students. In a district like Kalamazoo, in-service training for school staff was especially important because of the separation of Whites and Blacks into different areas of the District. This would mean that school would likely be the only place where young students of both races would mix on a regular basis. This placed a burden on defendants to make sure that all school staff, especially teachers, were given adequate preparation so they could help students overcome their cultural handicaps and dispell [sic] any racial stereotypes and distrust that the students might have so they could grow together in a positive way.

We pause here to point out that, as will be seen, the existing situation with respect to neighborhood segregation in Kalamazoo

was investigated at the trial only peripherally, and there is no substantial information in the record as to the extent to which the black youngsters currently in the system have "cultural handicaps" or the white youngsters think in terms of "racial stereotypes" or the extent to which teachers did not have the know-how or will to help overcome such "cultural handicaps" or dispel notions of "racial stereotypes" if the problem was a serious one. On the other hand, Ms. Johnson, the Executive Director of Instructional Services, testified, as we have seen, that, while there was some problem with teacher attitudes, her department carried on extensive in-service for teachers to sensitize them in these areas. Dr. Green, who did not hear Ms. Johnson testify, did indicate in his testimony that, based on what he had read in the Green-Cohen report, there was a need for more in-service training to sensitize teachers, but certainly there is not enough in this record to base a finding that a lack of in-service training has resulted in a denial of equal protection of the laws to black students.

As we have stated, at the heart of the litigation is the undisputed disparity in achievement between black students and white students in reading, language, mathematics and science and also the disparity in suspension rates and the claimed disparity in dropout rates. The district court, after stating that these facts were sufficient to establish a constitutional violation if they were related to a failure to remedy an unconstitutional condition, then in effect presumed that they were related and held that the presumption was not rebutted.

The district court stated its general reasons for placing the burden of proof of showing that such disparity was not related to constitutional deprivation on the defendants as follows:

> The reason for placing this burden on defendants is because they were found liable in this court's earlier opinion, thus they should be required to prove that they have remedied their violations. Another reason for placing this burden on defendants lies in the fact that they su-

pervise and control education in the District while plaintiffs do not. Mich.Const. Art. 8, § 3; M.C.L.A. 380.1201–.1347. Since they are the only ones with the power to remedy the violations, they should be required to prove that they have done so.

We cannot agree with these reasons for placing the burden of proof on the defendants. It is true that the defendants were found liable in 1971 and again in 1973, but the relief granted was immediately to place in effect a desegregation plan that had been prepared with the aid of computers, and the ancillary relief then sought by plaintiffs-appellees was not granted. Thus the liability of the defendants determined by the district court in 1971 and 1973, the district court has assumed for present purposes, has been satisfied. Further, while, as the district court states, the defendants supervise and control the Kalamazoo school system, plaintiffs-appellees certainly had access to all the information about the system. The district court ordered KBE to file a complete report, then on motion of plaintiffs appointed the two experts, Dr. Green and Dr. Cohen, to evaluate the report and gather further information about the system. The Green-Cohen report, of course, was available to all sides. Moreover, a reading of the record makes clear that the real posture of KBE at the trial was to support the general position of plaintiffs-appellees. This apparently resulted from a judgment by KBE that, based on its experience in this litigation, plaintiffs would prevail. Thus KBE's trial position, as made clear by its presentation and examination of witnesses, was that ESAA was necessary but, as it contended in its motion that it had filed, the state should be made to pay for it. In so doing, KBE of necessity had to generally support the position of the plaintiffs that there were ongoing effects of the pre-1971 segregation. KBE did appeal the district court's order requiring implementation of the Green-Cohen recommendations, but then had second thoughts and sought a remand; it wanted to defer presenting such appeal until after it was determined by the district court whether it or the state or both

would have to fund the Green-Cohen recommendations. This court denied the motion to remand in KBE's appeal, and when it filed its brief in such appeal (No. 80–1006, heard later by another panel) KBE then argued strongly for a reversal of the district court's order requiring implementation of the Green-Cohen recommendations. It was only then, apparently, did KBE feel tactically free to take an adversary position vis-a-vis the plaintiffs as to implementation of these Green-Cohen recommendations. Thus, in a nutshell, it is absolutely inequitable and unrealistic to place the burden of proof on the defendants, and particularly on SBE, in this case for the reasons given by the district court that are quoted above.

After, as we have indicated, the district court placed the burden of proof on SBE to show that continuation of the ESAA program was not constitutionally necessary and placed the burden of proof on KBE and SBE to show that implementation of the Green-Cohen recommendations was not constitutionally necessary, the district court then stated (App. 34A):

> After reviewing all the evidence, I conclude that defendants have not met their burden of proving that they have totally remedied the effects of their prior constitutional violations. This requires that further remedial relief be ordered.

The district court recognized that in making a determination whether the disparity in achievement and in suspension and drop-out rates was related to the "effects [on the black students] of the segregated schools which they attended" (App. 35A), the problem presented by students in grades ten through twelve was somewhat different from the problem presented by students in grades kindergarten through the ninth grade. This is true because it is without dispute that all black students in grades K–9, if they have been in the Kalamazoo system, have never attended anything but a majority white school. Thus the district court, in making its determination that such problems of both groups result from the prior segregation, appears to reach this result on a somewhat different basis as to each group.

With respect to the black students in grades ten through twelve, the district court said (App. 35A):

> Defendants had a duty to present positive evidence which would prove that students in grades 10–12 no longer suffer from the effects of the segregated schools which they attended. Defendants presented absolutely no evidence on this, and since these segregated experiences occurred when these students were young and informative, I will not presume that the intervening years have had a totally remediating effect.

We have already stated some reasons why the district court erred in generally allocating the burden of proof in this case, and we believe that such reasons equally apply to the question involving students in grades ten through twelve. We would agree that, at the inception of a desegregation effort, such as the situation that was presented to the Court in *Milliken II, supra,* the district court could, in ordering ancillary programs, presume that disparity in achievement was related to the segregated schools. Indeed, *Brown I* and *II* (347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)) are largely based on the proposition that segregated schools are inherently unequal. But we believe it is unrealistic to presume that this disparity in achievement is related to school segregation that ended in 1971 and that the district court erred in so presuming. We believe that this is particularly true in the light of the fact that, in 1971, only four elementary schools were identifiably black and that no other schools were identifiably black applying the ± 15% standard.

With respect to black students in grades K–9 who, to the extent that they have been in the Kalamazoo system, have always attended majority white schools, the district court first makes an ambiguous statement with respect to the burden of proof (App. 35A–36A):

> The students in grades K–9 also cannot be conclusively held to be free of the

effects of defendants' violations merely because they have only attended schools under the assignment plan. This is because such a holding would have to be based on two assumptions, neither of which has been tested in this case. First, I would have to assume that the reassignment of the students was sufficient to remedy defendants' violations—an assumption which is not necessarily true. *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). I would also have to presume that the violations' effects were confined to those students in the system at the time the attendance plan was adopted, and that these effects are slowly being purged from the system by the graduation of these students and the enrollment of new ones; yet this, too, is also not necessarily correct, for it ignores the fact that the victims of discrimination can include a wide range of individuals—including youngsters not enrolled at the time the assignment plan was adopted. These are the children who could have been recently enrolled, and despite the attendance plan, could still be suffering from the effects of defendants' violations.

Then, however, the district court seems to place the burden of proof on plaintiffs, stating (App. 36A):

It is, thus, my opinion that compliance with the attendance plan could, at most, only raise a presumption that the students in kindergarten through ninth grades have not been affected by defendants' violations. This could be rebutted by evidence that in fact they are suffering from these effects. Such proof was presented in this case.

The district court proceeds (App. 36A) to find that the disparity in achievement, suspensions and dropouts of black students in grades K–9 was related to the neighborhood segregation that it had found KBE and the State of Michigan responsible for in 1973. It pointed out that it had found the state responsible for such segregation partly because its courts had enforced racial covenants, and stated that it was no answer that enforcement of such covenants had been banned by *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), since 1948. (App. 36A–37A) It also pointed out that it had found the state responsible for such segregation because it had failed to revoke licenses of real estate salesmen who guided customers to areas based on race. (App. 36A) It further pointed out that it had in 1973 found KBE responsible for such neighborhood segregation because of the way it drew attendance lines, placed new schools, used optional zones, etc. (App. 36A)

It will be remembered that, as is reflected in the Green-Cohen report (at 2), in 1970 Kalamazoo had a population of 85,661 of which 8,500 were black, and that 75% of these black people lived in census tracts two and three, one of which was 79.8% black and the other of which was 58.7% black.

With respect to the current situation, the district court stated that "Dr. Green testified that Blacks were still confined to areas I described in 1973." (App. 37A) The district court went on to find that the disparity in achievement and rate of suspensions and dropouts of black students in grades K–9 were attributable to neighborhood isolation in the following language:

Dr. Green testified that this racial isolation would have a damaging impact on parents and children and could affect a child's performance in school and result in low achievement and negative attitudes. The State presented no evidence to counter this. I find Dr. Green's testimony to be more credible because it has been recognized that environment plays a role in student performance, so that children who have been culturally set apart from the larger community acquire habits of speech, conduct, and attitudes reflective of their isolation. *See, Milliken II, supra* [433 U.S.] at 287, 97 S.Ct. at 2761, 53 L.Ed.2d at 760; *Martin Luther King Elementary School Children v. Ann Arbor School District*, 473 F.Supp. 1371 (E.D. Mich.1979). This was supported by the Green-Cohen report which reported that many teachers blamed low Black achieve-

ment on factors that could be linked to their environment. When asked why Blacks were under-enrolled in select mathematics, 21% cited "environmental factors;" as for the low enrollment in English, 13% pointed to the "cultural background" of Black students, and another 27% listed "low language skills" and the children's inability to speak "correct English"—problems associated with being culturally isolated. Among other reasons given for low achievement were: "low self-concept," negative attitudes, "lack of chance," lack of motivation, Black discipline problems, and immaturity on the part of Black students—all of these, however, could merely be symptoms reflective of the students' isolation.

This evidence leads me to conclude that even though many of the District's Black students may know nothing but an integrated school, this has not been sufficient to remedy the effects of their being racially isolated by defendants' actions. Much of the low achievement documented by Drs. Green and Cohen can be linked to this, and this requires that cognitive and behavioral programs be continued. It also justifies the continuation of programs concerned with student suspensions and dropouts because Dr. Green testified that student misbehavior and dropouts can be tied to the frustrations of low academic performance.

This finding and determination by the district court is based on some testimony by Dr. Green at the very end of his lengthy testimony. Counsel had indicated that they were through questioning Dr. Green, the court then thanked Dr. Green for his testimony and advised him "you are very helpful" for which Dr. Green thanked the court. (App. 418A) The court then took a recess and called Dr. Green back to the stand and questioned him as follows:

EXAMINATION OF DR. GREEN

BY THE COURT:

Q Doctor, in my opinion I found that actions of the State and Kalamazoo Board of Education have acted to confine blacks to various areas in Kalamazoo.

For example, the State had permitted landowners to place racial covenants in deeds, and this helped confine the black population.

A (Indicates yes.)

Q The Kalamazoo Board maintained residential boundaries in a predominant black area and worked with realtors to locate schools in outlying areas that were attracting white citizens.

Now, all of this, and other acts, caused blacks to be confined in particular areas of Kalamazoo.

Do you know if blacks are still heavily concentrated in these areas in the city?

A From conversations that I had with citizens when Dr. Francis Thomas and myself conducted the citizen interviews, it's my feeling that blacks are yet pretty heavily concentrated in the areas that historically have been set aside for the black community;—

Q All right.

A —that blacks are not scattered in any wide scale on a widescale basis throughout the city, but there are yet racially identifiable neighborhoods in Kalamazoo. That's my understanding.

Q Assuming that they are, what effect would this all-black enrollment have on a child's ability to perform in school?

A It would have a negative impact. When—

Q That is substantial?

A That is very substantial negative impact when neighborhoods are segregated. And, this is reflected either in building enrollment or course enrollment. Even though buildings might be desegregated, that has a negative impact, not only on the child's perception of himself and herself, but other perceptions that the district personnel often will have of that child.

There is yet a tendency in our society in such arrangements for people in general to view those who have been isolated by force, who have been restricted by law, or restricted by custom and practice, there is a

tendency, and this is reinforced over the years, to perceive that group as being a weak, defenseless and very often an inferior group. This carries over into the school system.

Q And, this has gone on for years?

A That has gone on for years.

Q And, the prospect is that it will go on for more?

A Yes. As a matter of fact, now, then, it's my feeling, based upon the practices and customs that have existed for years, the housing segregation is going to be with us for years to come, which places even a greater responsibility and burden on the school district to make that additional extra effort to make sure that youngsters are not in any way segregated within its confines.

Neighborhoods are going to be segregated, I believe, yet for—for a long period of time. Even though there are laws in opposition to the housing segregation, the practice yet occurs.

Recent study in Detroit, in the Detroit area, looking at HUD data, found that when—the most classic study is a study by Diane Pierce who is working on a doctorate at the University of Michigan—at the time now I believe she is at the University of Illinois, Circle Campus, and Dr. Darden, a geographer, looking at segregation in housing, they all conclude that even the laws restrict realtors as it relates to practicing segregation, that in reality they yet do, in very subtle ways. And HUD data focuses on this point, too,—

Q The consequence of the vestige of the covenants in deeds even fostered by the State and the courts of the State?

A Yes.

Q Now, there are children in school who have parents who were the victims of that discrimination?

A Yes, sir.

Q Is that a fact?

A That's a fact. And, that has an effect—it will have a lingering effect for years to come; a ling—a lingering effect in that parents recall and remember the restrictions placed upon them. This sometimes will allow parents to lower their sights; and when parents have sights that have been lowered, very often that has an impact on the sights that children, or goals and aspirations children might have.

Racially isolating people from a housing standpoint has a pervasive effect, too, in other areas. If you restrict a person from a housing standpoint, that can be demoralizing to the extent that they don't seek out other opportunities in employment, and also in education as well.

So, it does have a lingering effect.

Q And, this was State action?

A Yes.

Q I have my opinion, that there are three or four pages devoted to this subject.

A I see.

Q And, those are my findings.

A Yes, sir.

Q And, I found that because I looked for them in the law.

A Yes, sir.

Q And, it is one of the most compelling reasons for segregation—

A Yes.

Q —and its consequences.

There are parents, then, of school children that have had this unconstitutional segregated life?

A That is true. And, states typically have not taken the leadership or initiative to end segregation in housing statewide.

As a matter of fact, I recall that even the federal government at the national level has provided leadership, and states have ceased to do so.

For example, January 2nd, I believe, of 1963, President Kennedy signed the National Anti-Discrimination Bill in the area of housing. That's an example of how the federal government stepped ahead of state governments. States have not taken leadership to ending segregation in school districts that were a part of this statewide school system. And, they had the constitutional obligation to do so.

Q Now, if parents, or the children who are children of parents who have lived this vestige of slavery and the consequences of the vestige of slavery, if these parents received an education that was not equal to that of their peers, could that affect the ability to aid the children academically and consequently result in their children falling behind children of parents; white parents?

A Absolutely. When you restrict the opportunities of adults, it has a direct impact on what parents can do for their children. Parents who have every opportunity and total access to the system, they become the beneficiaries of that system.

When parents attend schools which raises not a stigma, when they are not separated out, ferreted out and identified as being minority, and in turn treated as a minority, are treated in a society in which skin color and race are important matters, that will not only have an impact on the parents, but it is visited upon future generations.

Even when black youngsters, through a set of circumstances including luck, and I mean just that; luck is very often a factor, are able to in some way twist and turn and get through the system even though their parents have been limited, they yet are not in a position, even though they might become college graduates, to do for their children that college graduates who have not been restricted because of race are able to do for theirs. Then they in turn yet have to work to tutor their children who might be a part of the system in which the lingering effects of the old justice system is now being felt.

Yes, when parental opportunities are limited, it has a very direct negative and debilitating impact on the ability of the parents to devise every opportunity for their child.

THE COURT: Anything else?

MR. ATKINS: Your Honor, just one brief question, if I might.

We do not believe that the relief granted by the district court with respect to black students in grades K–9 can, as the district court did, be based on this testimony as to neighborhood segregation.[11] In the first place, the testimony as to the condition of neighborhood segregation is entirely hearsay, and while not objected to, counsel cannot be expected to object to the court's questions that elicit hearsay answers. In the second place, until the court's questioning of Dr. Green, it is clear that the lawsuit was being tried on all sides on the theory that the relief sought by plaintiffs was required by a denial of equal protection *in the schools*, and the court, by its questioning, introduced an entirely new and different theory and then, in its opinion filed later, found the theory to be supported and based its grant of relief in substantial part on such theory. Certainly, even if neighborhood segregation can in theory be the basis for granting of ancillary relief long after a school system has been desegregated, the defendants should have been given a reasonable opportunity to introduce proof as to the extent of such segregation, as to their responsibility for such condition since 1971, and as to whether there actually is a nexus between such condition and the disparity in achievement and suspension and dropout rates, to the extent they really exist, in the Kalamazoo school system.[12]

We have determined that the district court erred in concluding that KBE had the duty to desegregate students within schools and in school activities so that black students would be proportionately represented in the various courses and activities; and we have determined that the district court erred in holding that black students had been denied equal protection because of a

11. Although the district court relied on neighborhood segregation in granting relief with respect to grades K–9, its questioning of Dr. Green, *infra*, indicated that it was considering granting relief on the basis that the black students' parents attended segregated schools.

12. As shown by the Green-Cohen report, lack of parental support for school endeavors of the black students was the most frequently cited factor by KBE teachers in explaining their particular problems. In this connection, see, for example, Miller, Hard Realities and Soft Social Science, The Public Interest, Spring 1980, No. 59 at 67.

lack of in-service training of KBE administrators, teachers and other personnel. We have further determined that the district court erred in finding that the current disparity in achievement and in suspension rates and the claimed disparity in dropout rates of students in grades K–9 was caused by neighborhood segregation and that KBE and the State of Michigan are responsible for such neighborhood segregation since 1971. We have still further determined that the district court erred in placing the burden of proof on KBE and SBE to show that such disparity in grades 10–12 was not caused by an unconstitutional condition as to which KBE and the State have been found to be responsible during the course of this litigation.

With respect to black students in grades K–9 *and* in grades 10–12, and laying aside the errors made by the district court heretofore discussed, we conclude that there is not sufficient evidence in this record, viewed as a whole, to support the conclusion that the disparity in achievement and in suspension rates and the claimed disparity in dropout rates of black students was caused by an unconstitutional condition as to which KBE and the State have been found to be responsible. While there is this disparity in achievement between black students and white students on the average, it is also true that both groups have improved in their achievement since 1971. (App. 605A) This fact was not considered in the district court's opinion, and it should have been considered as a threshold matter in determining whether black students have been denied equal protection. There is no evidence in the record of individual cases of representative black students who were not achieving well and therefore there is no attempt to relate such conditions to unconstitutional deprivation. Moreover, the Green-Cohen report and Dr. Green are of the view that the disparity in achievement is primarily related to the failure of the system to mainstream black students who need compensatory or special education and to deliver these services to the students there. Also both the Green-Cohen report and Dr. Green are of the view that it *may*

be true that many black students are perceived to need compensatory or special education when in fact they do not and that that misconception results from mistakes made by persons making individual evaluations of students or from defects in the tests used in determining the capabilities of students. Yet there is not sufficient evidence in the record to support a finding that such failure to have adopted such mainstreaming and such mistakes in designating students for compensatory or special education were a result of an intent to discriminate.

We therefore conclude that the order of the district court requiring continuation of the ESAA programs and the implementation of the Green-Cohen recommendations must be vacated.

The orders of the district court in Nos. 79–1042 and 79–1101 are affirmed and the order of the district court in No. 79–1723 is vacated and the case is remanded.

## APPENDIX

[306]

### 3. Curricula (Academic Programs)

Although the District has made substantial progress in moving toward racial desegregation with respect to school buildings, certain academic programs are currently as segregated by race as the school buildings were prior to the Judge's desegregation order.

Racial segregation in such critical areas as reading, language development, and mathematics, as well as in compensatory education and special education, begins at the elementary school level and continues throughout junior and senior high school.

The finding of racially disproportionate enrollments in these course areas and programs leads to the conclusion that the District must begin immediately to demonstrate greater commitment to the task of providing equitable educational programs for all students. This is especially important in the areas of reading, language development, and mathematics. Unless stu-

dents receive the foundation for basic skill development beginning at the kindergarten level, the stage is set for the impaired development of skills in these and other areas at later grades. Therefore, it is recommended that:

a. *Beginning with kindergarten and extending to the senior year of high school, a common set of goals, objectives, and expectations, and a common curricula for all students at each grade should be established.*

[307]

b. *A school district working committee, organized by the Superintendent with the support of the Board of Education, and approved by the Court, should be established. The general goal of this committee would be to provide a common set of specific academic goals and objectives across all programs and grade levels. These goals should be reviewed on an annual basis and revised where necessary in order to facilitate the continuing growth of all students in the academic system.*

c. *District expectations for students in grades K–12 should be listed and distributed to all teachers and counselors, with these expectations being reviewed every year.*

It is imperative that curriculum emphasis be placed on the basic skills of reading, language development, and mathematics. Until Black and other minority children in grades K–6 who, with their families, have been the victims of segregative practices in the past master the basic skills in these areas, it is recommended that:

d. *A special effort should be made to provide appropriate instructional programs for all minority students who have been the victims of inequitable and segregated instructional programs, so that they will master the goals and objectives considered appropriate for majority students.*

e. *Student progress should be monitored beginning at the kindergarten level. Furthermore, when learning problems*

[308] *appear, they should be corrected immediately, with re-instruction and reinforcement of the basic learning skills. Beginning at kindergarten, the academic program emphasis should be linked to the mastery of the common objectives.*

Academic programs involving tracking or ability groups should be reexamined and revised with the objective of eventually discarding them, as they lead to the use of materials which reinforce students at low achievement levels and facilitate the realization of self-fulfilling prophecies in terms of academic performance. Tracking not only leads to student placement in remedial and non-college-bound programs, but also brings about a locking-in phenomenon in terms of the materials used, teacher perceptions of students, student self-concept, and student motivation. It is further recommended that:

f. *The educational status of students in grades 7–12 who are enrolled in remediation courses or have been placed or are enrolled in lower-level, non-college-bound courses in reading, language arts, and mathematics should be reviewed in August, 1979. These students should be mainstreamed into regular classes as soon as possible, with adequate support systems established to facilitate this transition.*

For example, students in reading classes should be mainstreamed into English classes, while students in individualized or tutored mathematics should be mainstreamed into upper-level mathematics.

[309]

Ability grouping, tracking, and decisions about student placement in academic versus non-academic programs often involve individual and group aptitude and achievement tests.

For example, in the area of reading, a sixth grade student who has completed a set of reading objectives and has obtained a creditable score on a test designed by the producers of the reading program may or may not be assigned to a seventh grade English class. Instead, the student may be placed in another reading sequence with the

same reading program at the seventh grade level.

Also, different performance levels on aptitude tests are related to the placement of students in special education versus regular classes. Therefore, considering the disproportionate number of Black students who are placed in low level academic programs and/or special education classes, it is recommended that:

g. *A systematic and rigorous examination of the total testing program in the Kalamazoo Schools should be conducted. Individuals who are knowledgeable about test reliability, validity, and possible test bias should be consulted to determine whether or not aptitude and achievement testing contributes to racial disproportionality in academic programs. The objective of this examination should be to minimize possible bias in assessment practices leading to student placement in low-level academic programs.*

[310]

Since the data reported in Chapter IV indicate that the existing compensatory education programs are not overcoming student academic handicaps, and that these programs are self-reinforcing in that students continue to receive remedial content, it is recommended that:

h. *The compensatory education programs should be modified or new programs developed which will help students overcome academic handicaps rather than continuing indefinitely to receive remedial education. Procedures should be considered and developed in which compensatory education can be built into the regular classroom so that compensatory education students also achieve the objectives common to all District students.*

i. *Criteria for placement in special education classes should be assessed. A concerted effort should be made to reduce the number of students in such programs, while mainstreaming special education students as rapidly as possible so that they can achieve the same goals and objectives as other students.*

j. *Careful monitoring of the new bilingual and "gifted" programs should occur so that they do not become and remain separate and segregated entities.*

[311]

### 4. Class Absences, Retentions, Suspensions, and Dropouts

Racial disproportionality with regard to high school class absences, elementary school retentions, and high school suspensions and dropouts has been present in the Kalamazoo school system. Given these findings, it is recommended that:

a. *Special attention should be paid to the high rate of absences, retentions, suspensions, and dropouts among Black and other minority students. Every effort should be made to increase the minority students' chances of academic success and involve them more fully in the academic process of schooling. These efforts should include programs aimed at mainstreaming students into regular academic programs, as well as providing both tutorial and counseling support.*

b. *The discipline code should be well known and understood by administrators, teachers, and counselors. It should be followed carefully, with monitoring of suspensions of minority students and the reasons for suspensions.*

c. *The Superintendent and his staff should assume direct responsibility for decreasing the dropout and suspension rate.*

### 5. Extracurricular Activities

By chance alone, one would not expect extracurricular activities to be racially isolated. Yet, as reported in Chapter IV, this is what was found for such secondary school activities as basketball, baseball, hockey, debating, camera club, and drama. Therefore, it is recommended that:

[312]

a. *Besides the academic programs, extracurricular activities should be monitored to insure every youngster an opportunity to participate. Procedures need to be developed to let students know that*

they are welcome to participate in all school activities and can succeed in these activities.

b. *A common set of activities should be offered at all of the schools at each school level and students should be encouraged to be involved in these activities.*

Lack of equipment, prior low participation, or distance should not be barriers to ending racially exclusionary extracurricular programs.

## 6. Inservice Training

Inservice training for teachers, administrators, counselors, and other school personnel can help in the effort to make the educational process successful for all students in a desegregating school system.

Junior and senior high school counselors reported that they used student performance as the major criterion variable in placement, while sixth-grade teacher-counselors reported their belief that poor Black student achievement is related to parental, economic, and environmental malfunctioning, as well as to the students' ability level and prior experiences. Interviews with regular classroom teachers also revealed that at least half of them had different goals and [313] objectives, as well as different expectations, for different students. Therefore, it is recommended that:

a. *A program of inservice activities be instituted for all teachers and counselors, as well as other support staff. These activities should begin in the fall of each year and continue throughout the academic year. Teacher inservice workshops should be held at all grade levels to clarify the common goals and objectives which have been set for students at each grade level. Ways of achieving these goals should also be considered. Factors related to student achievement, such as curriculum materials, reinforcement and feedback techniques, mastery concepts, teacher attitude, and student motivation should be explored in a systematic way, as teachers need to understand the dynamics of school success for all children.*

b. *The inservice training should be conducted by individuals with prior experience working in a desegregated district or in a district in the process of desegregating. Such a person or persons should also be knowledgeable about procedures for facilitating the acquisition of basic academic skills.*

Since it was found that many counselors and teacher-counselors are unfamiliar with the District counseling guidelines, it is recommended that:

[314]

c. *Guidelines should be provided to all counselors and teacher-counselors during inservice programs so that they are familiar with them. Training sessions should also take place on the counseling code. Monitoring of the degree to which counselors are following the code should also occur.*

Since leadership is essential for developing a climate favorable for implementing desegregation, it is recommended that:

d. *Workshops should also be held for school administrators to familiarize them with the goals of desegregation, legal aspects, how to mobilize a district to desegregate, and the role responsibilities and implementation guidelines that administrators should follow in bringing about successful desegregation.*

e. *A program of evaluation should also be established concurrently with the workshop programs, in order to monitor the effects of the programs and improve them as needed, making sure that the focus of the inservice training is not on the individual alone, but on the total school-community relations process.*

f. *Strong consideration should be given to inservice training programs involving both parents and students to assist them in understanding ways in which school programs can function successfully without racial considerations.*

[315]

## 7. Program Monitoring

It is of critical importance that the recommendations outlined in this report, if ac-

cepted by the Court, be acted upon in an expeditious and well-considered manner. It is recommended that:

a. *A monitor should be appointed to oversee the desegregation process. This person should be hired on a full-time basis for a three-to-five year period. The monitor should report to the School Superintendent, with periodic reports and information made available to the School Board and to the Court.*

b. *The monitor should be a highly trained person in the field of education, should have had teaching and/or administrative experience, and should be knowledgeable about the educational desegregation process. He/she would report on the progress being made in correcting the current academic program inequities. In addition, this person would oversee the efforts being made in implementing in-service programs and reducing the numbers of suspensions and dropouts, and would also have the responsibility of coordinating remedial measures to insure that equal opportunity goals in the area of staff employment are being met.*

## 8. Community Relations

Kalamazoo had all of the potential for the turmoil and violence that occurred in the Pontiac, Michigan and Boston, Massachusetts [316] desegregation cases. However, even though there was well-known community resistance to educational desegregation, the open conflict, turmoil, and school closings that occurred prior to desegregation did not occur after Judge Fox's order went into effect. Excellent community leadership roles exhibited by such groups as the Kalamazoo branch of the NAACP, highly respected Whites in influential community positions, and the *Kalamazoo Gazette* combined to allow the law to be enacted with a modicum of resistance and with no overt displays of hostility and violence.

For this the school district and the community should be congratulated. In order to insure that this continues, it is recommended that:

*A community-wide citizens' committee should be established by the Board of Education, with approval of the Court. The committee should receive, on a regular basis from the District, reports, based on current data, concerning the progress of all aspects of desegregation. This committee would work with the Court-approved monitor in order to support the desegregation of buildings, programs, and staff.*

WEICK, Circuit Judge, concurring in part and dissenting:

I agree with much of the well written majority opinion which details at great length the history of this small school desegregation case over a period of nine years which is all too long and I think it is about time to write finis to it.

## I

I concur in the vacation of the order of the district court in appeal No. 79–1723 but not in the remand for further proceedings, as I believe it is unnecessary. The order vacated was improvidently entered since the district court was usurping the functions of the Board of Education by providing many years after the alleged constitutional violation had been eradicated costly ($651,289.54) and unnecessary programs involving educational components and assessing the cost thereof not against the original wrongdoer, Kalamazoo Board of Education (KBE), but against only the State Board of Education (SBE). The State Board was not a party defendant in the case at the time the district court entered its temporary mandatory injunction eight days after the filing of the suit on August 12, 1971, putting in full force and effect the Racial Balance Plan adopted by a rump Board of Education (KBE) by a 4 to 3 vote, two members of which were replaced in an election held a few weeks thereafter and the Racial Balance Plan was promptly rescinded by the new local board of education, so that the plan was not implemented or in effect at the time the district court adopted and placed in full force and effect the rejected plan. In adopting it, not much of a hearing was afforded to anyone.

It is submitted that nothing like this has ever happened before in the annals of jurisprudence but apparently anything goes in a school desegregation case. There was never any claim in this case that the State Board of Education had anything to do with the rump local Board adopting a Racial Balance Plan or with the newly elected Board rescinding it.

It is significant that although the Kalamazoo Board (KBE) appealed from the mandatory temporary injunction adopting the Racial Balance Plan and the preliminary mandatory injunction entered a few days thereafter, nevertheless KBE commenced immediately to comply with the mandatory injunctions and completely balanced the races in the Kalamazoo school system in September 1971. This was provided by busing about 60 percent of the children attending the schools. This should have finished the case but it did not.

There is not an iota of evidence that the races were not balanced in September 1971. The district court made no findings that any imbalance still existed. Nevertheless on November 30, 1979, the district court entered the order that the State of Michigan pay $651,289.54 to the local Board for funding the ESAA educational programs for 1979–1980. This was seven years after the races had been balanced in the Kalamazoo school system and the children had been attending school in a unitary system over all of the years.

The obvious reason why the district court assessed the State of Michigan rather than the local Board was the State could pay this money to the local board out of its unappropriated funds. Without such reimbursement, the local Board would be compelled to collect from local taxpayers. The district court placed the burden on all of the taxpayers of Michigan to pay for the Kalamazoo educational programs which previously had been paid by the federal government.

The aptitude of the black children attending the Kalamazoo schools compared favorably with that of black children attending other Michigan public schools which did not have such programs so that in reality they were not necessary.

In *Milliken v. Bradley*, 433 U.S. 267, 295, 97 S.Ct. 2749, 2764, 53 L.Ed.2d 745 (1976), Mr. Justice Powell, concurring in the judgment stated:

First, it is argued that the order to pay state funds violates the Eleventh Amendment and principles of federalism. Ordinarily a federal court's order that a State pay unappropriated funds to a locality would raise the gravest constitutional issues. See generally *San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 40–42 [93 S.Ct. 1278, 1300, 36 L.Ed.2d 16] (1973); *National League of Cities v. Usery*, 426 U.S. 833 [96 S.Ct. 2465, 49 L.Ed.2d 245] (1976).

In the present case, the district court in holding that the state participated in unconstitutional violations relied on wholly impermissible factors, namely, housing patterns and covenants in deeds restricting sales for which conditions the court blamed the state. These are all matters for which the state was in no wise responsible and owed no duty to eliminate. There was no proof that the state participated in any constitutional violation of the rights of black school children attending the Kalamazoo school system.

The Supreme Court has repeatedly held that the school boards are under no constitutional duty to balance the races in the public school system but these holdings have not been uniformly adhered to by the lower courts.

In *Milliken v. Bradley, supra,* in footnote 14, the court stated:

Thus, the Court had consistently held that the Constitution is not violated by racial imbalance in the schools, without more. *Pasadena Bd. of Education v. Spangler*, 427 U.S. 424, 434 [96 S.Ct. 2697, 2703, 49 L.Ed.2d 599] (1976); *Milliken I*, 418 U.S., at 763 [94 S.Ct., at 3136] (White, J., dissenting); *Swann, supra,* [402 U.S.] at 26 [91 S.Ct. at 1281]. An order contemplating the " 'substantive constitutional right [to a] particular degree of racial balance or mixing' " is therefore

infirm as a matter of law. *Spangler, supra,* at 434.

See also, *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1 [91 S.Ct. 1267, 28 L.Ed.2d 554] (1971)

It was not until September 18, 1979, that KBE filed a motion in the district court to make the Treasurer of the State of Michigan a party defendant which was granted so that the district court could order him to disburse unappropriated funds of the state to the local board of education to pay for the ESAA program for 1979–1980 amounting to $651,289.54. No doubt another motion will be filed for the year 1981–1982. No remand should be made for further consideration by the district judge.

## II

I also dissent from the affirmance of the orders of the district court in appeals Nos. 79–1042 and 79–1101. They involved the validity of the appointments made by the district court of Green and Cohen, so-called experts and their research assistants to assist the district court in the performance of his judicial duties and the validity of allowances of compensation to the research assistants of $28,815.

In 1977, as stated in the majority opinion, the district court had ordered KBE to file a written report within the 21 days on its implementation of the court's desegregation order and other details. On motion of the plaintiffs, the court on December 7, 1977, appointed Green and Cohen who are affiliated with Michigan State University and the University of Michigan, respectively, as the court's experts to evaluate the report and to make recommendations and authorizing them to employ staffs and providing that the allowances would be taxed as costs. There was no claim that the court was in any wise incompetent to evaluate the report. The judge had been living with the case since 1971 and if we do not finish it the case will be with him until he expires. The majority opinion details the many proceedings which the judge conducted and the appeals including the present which total eight. The state board appealed from the order of the district court appointing the experts but it was dismissed for lack of a final appealable order. It has now become final because of the allowances made and we have jurisdiction to review it.

In my opinion, the appointment of masters or experts by a federal court in the present case to perform judicial functions is not authorized. Such references should be the exception and not the rule save in matters of account and difficult computation of damages and then on a showing that exceptional conditions require it. Rule 53(b), Fed.R.Civ.P. *LaBuy v. Howes Leather Co., Inc.,* 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1967). No such conditions existed in the present case. The district judge apparently did not need the so-called experts and their staffs when he put into effect the Racial Balance Plan and the many hearings he conducted thereafter. It was only after the races had been balanced when the case should have been terminated that he sought the aid of the experts in 1977 in order to adopt so-called educational components costing over $600,000.

The judge had already to use his own expression, "socked" the state and the local board enough. See 576 F.2d 714 at 717. He allowed seven lawyers for the plaintiff from New York, Washington and Memphis attorneys fees totaling $507,066.50 which included a multiplier of two as a bonus. He even allowed $15,000 to one of the plaintiffs for volunteered paralegal services. On appeal we held the multiplier was unauthorized and we modified the allowances further. 576 F.2d 714. In addition court costs of over $100,000 were assessed. The attorneys for the local and state board also had to be paid. All of this in a small school desegregation case involving a total of only 17,285 school children of whom 2,800 or 16.2 percent were black. If this case is not now concluded, we can expect more applications for fees, expenses and costs.

It is about time that the federal courts let loose with this case. I would vacate all of the orders and remand with instructions to dismiss the case.